# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| B.H.T., individually and on behalf of D.T., a minor child, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) | |
| SUMNER COUNTY BOARD OF EDUCATION d/b/a SUMNER COUNTY SCHOOLS; TENNESSEE DEPARTMENT OF EDUCATION; PENNY SCHWINN, Commissioner of Education; TENNESSEE SECRETARY OF STATE, ADMINISTRATIVE PROCEDURES DIVISION; ELIZABETH D. CAMBRON, Administrative Law Judge; and THOMAS G. STOVALL, Administrative Law Judge, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge

Magistrate Judge |
| Defendants. | ) | |

## COMPLAINT

NOW COME Plaintiffs B.H.T., individually and on behalf of D.T., a minor child[1] ("Plaintiffs"), by and through counsel, and for their Complaint against Defendants Sumner County Board of Education d/b/a Sumner County Schools

---

[1] Plaintiffs are identified with initials pursuant to Fed.R.Civ.P. 5.2 so as to protect the identity of the minor child as such would be obvious if the full name of the parents were pleaded.

("SCS"); Tennessee Department of Education ("TNDOE"); Penny Schwinn,

Commissioner of Education ("Schwinn"); Tennessee Secretary of State,

Administrative Procedures Division ("APD"); Elizabeth D. Cambron,

Administrative Law Judge ("ALJ Cambron"); and Thomas G. Stovall,

Administrative Law Judge ("ALJ Stovall") (collectively "Defendants"), hereby

state as follows:

## TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................5

JURISDICTION AND VENUE ..............................................................5

PARTIES.................................................................................................6

STANDARD OF REVIEW OF ADMINISTRATIVE DECISION........................9

FEDERAL STATUTORY OVERVIEW ............................................11

    Development of the IEP...................................................................12

    Parental Participation in the Education of Their Child With a Disability...........14

    Evaluations / IEEs .........................................................................15

    Extended School Year (ESY) Services...............................................17

    Reimbursement for Unilateral Private Placement ..............................18

    Procedural Safeguards ...................................................................19

    Parents' Rights in a Due Process Hearing / 45 Day Rule....................19

    Requirements of Due Process Hearing Officers..................................22

    Parents' Rights to Review Their Child's Records..............................22

    Administrative Decisions and Remedies ...........................................23

TENNESSEE REGULATORY SCHEME FOR SPECIAL EDUCATION ..........24

    Special Education Dispute Resolution..............................................25

    Requirements of Administrative Law Judges....................................26

ABOUT TNDOE ................................................................................27

ABOUT THE APD .............................................................................29

THE PRACTICAL EFFECTS OF TNDOE'S APPOINTMENT OF THE APD AS ARBITERS OF SPECIAL EDUCATION DISPUTES...........................................31

FACTUAL BACKGROUND...............................................................32

PROCEDURAL HISTORY..................................................................47

COUNT ONE – SYSTEMIC VIOLATION OF THE 45 DAY RULE .................59

COUNT TWO – SYSTEMIC VIOLATION OF THE ADJOURNMENT RULE .66

COUNT THREE – SYSTEMIC VIOLATION OF THE ACCESS TO RECORDS PROCEDURAL SAFEGUARD .............................................................70

COUNT FOUR – DECLARATORY JUDGMENT ON NON-APPLICABILITY OF THE TN URP AND TRCP TO IDEA CASES ..................................76

Case 3:20-cv-00732     Document 1     Filed 08/27/20     Page 3 of 153 PageID #: 3

COUNT FIVE – SYSTEMIC VIOLATION OF IDEA BY ALLOWING DISCOVERY IN SPECIAL EDUCATION DUE PROCESS CASES...................84

COUNT SIX – SYSTEMIC VIOLATION OF HEARING OFFICER QUALIFICATIONS ..........................................................................87

COUNT SEVEN –VIOLATION OF THE TENNESSEE CODE OF JUDICIAL CONDUCT / RECUSAL RULES ..........................................................92

COUNT EIGHT –VIOLATION OF THE BURDEN OF PROOF .........................96

COUNT NINE –FRAUDULENT MISREPRESENTATION ...............................99

COUNT TEN – APPELLATE REVIEW: LEGAL ERRORS.............................104

COUNT ELEVEN – APPELLATE REVIEW: FACTUAL ERRORS.................111

COUNT TWELVE – DENIAL OF FAPE ...........................................................114

COUNT THIRTEEN – PROCEDURAL VIOLATIONS OF IDEA CONSTITUTING DENIAL OF FAPE .................................................................120

COUNT FOURTEEN – SYSTEMIC VIOLATION OF THE INDEPENDENCE OF THE ADJUDICATING BODY OF SPECIAL EDUCATION DISPUTES ...122

COUNT FIFTEEN – SYSTEMIC ABUSE OF PROCESS ..................................129

COUNT SIXTEEN – VIOLATION OF §504.......................................................133

COUNT SEVENTEEN – VIOLATION OF ADA................................................138

COUNT EIGHTEEN – §1983 SYSTEMIC CIVIL RIGHTS VIOLATIONS .....142

COUNT NINETEEN – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ..............................................................................................148

COUNT TWENTY – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ..............................................................................................151

## NATURE OF THE ACTION

1.      This matter arises as an appeal from a Final Order in the

administrative special education due process matter captioned *D.T., et al. v.*

*Sumner County Schools*, APD Dkt. No. 07.03-152098J ("DP Case").  *See* 20

U.S.C. §1415(i)(2)(A) ("Any party aggrieved by the findings and decision made

[in a due process hearing] shall have the right to bring a civil action with respect to

the complaint presented pursuant to this section, which action may be brought in

any State court of competent jurisdiction or in a district court of the United States,

without regard to the amount in controversy.")

2.      This matter also arises from systemic flaws in TNDOE's system for

resolving special education cases in the State of Tennessee and the APD's and

ALJs' illegal implementation of such system that has directly harmed Plaintiffs as

explained below.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to

federal question jurisdiction 28 U.S.C. §1331, premised upon the federal

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415(i)(3)(A)

wherein it provides that "The district courts of the United States shall have

jurisdiction of actions brought under this section without regard to the amount in

controversy"; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et*

*seq.* ("§504"); and the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.*

("ADA").

4.     SCS, TNDOE, Schwinn, APD, ALJ Cambron and ALJ Stovall may be

sued in this Court as Congress abrogated state sovereign immunity "from suit in

Federal court for a violation of [IDEA]." 20 U.S.C. §1403(a).

5.     Plaintiffs have exhausted their administrative remedies as a final and

appealable Order was entered in the DP Case on June 29, 2020 after hearing. *See*

20 U.S.C. §1415(l); *see Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 197

L. Ed. 2d 46, 580 U.S. __ (2017).

6.     This Court may order declaratory and injunctive relief pursuant to 28

U.S.C. §§2201 and 2202. The Court has supplemental jurisdiction to adjudicate

any state claims, which may arise out of the same facts as the federal claims

asserted herein pursuant to 28 U.S.C. §1367.

7.     Personal jurisdiction exists over the Defendants because they are all

residents or arms of the government of the State of Tennessee.

8.     Venue is proper pursuant to 28 U.S.C. §1391 as all the events giving

rise to the claims herein occurred in this District.

## **PARTIES**

9.     D.T., whose date of birth is 07/24/2010, is a child diagnosed with

limited verbal Autism and Central Auditory Processing Disorder ("CAPD"). D.T.

is eligible for special education and related services under the Individuals with Disabilities Education Act, 20 U.S.C. §§1400 et seq. ("IDEA") and protection under Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("§504"); the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.* ("ADA"); and Tennessee's Special Education Law, T.C.A. §49-10-101 *et seq.* ("TNSEL").

10. B.H.T. is D.T.'s mother who resides with D.T. at 444 Wemyss Street, Gallatin, TN 37066.

11. Defendant SCS is a Local Educational Agency ("LEA") as that term is defined by 20 USC §1401(19) and 34 CFR §300.28 and a public agency of the State of Tennessee with its principal place of business located at 695 E Main St, Gallatin, TN 37066. SCS is a public school system in the State of Tennessee and receives funding from the Tennessee Department of Education ("TNDOE") and federal funding for IDEA. As such, it is responsible for ensuring compliance with all mandates arising under the numerous federal statutes for providing special education to the school age students residing within its district.

12. Defendant Tennessee Department of Education ("TNDOE") is a State Educational Agency ("SEA") as that term is defined in 20 U.S.C. §1401(32); 34 C.F.R. §300.41; and a "public entity" as that term is defined in 42 U.S.C. §12131(1); 28 C.F.R. §35.104; and otherwise receives federal funds for special education under various federal statutes and, as such, is responsible for establishing

and maintaining a system for resolution of disputes and ensuring compliance with all mandates arising under the numerous federal statutes for providing special education through its Department of Special Education ("TNDSE"). TNDOE has its principal place of business located at 710 James Robertson Parkway, Nashville, Tennessee 37243.

13.     Penny Schwinn is Tennessee's Commissioner of Education ("Schwinn") and is the officer in charge of the TNDOE. Schwinn is named herein in her official capacity.

14.     Tennessee Secretary of State, Administrative Procedures Division ("APD") is an Executive Branch agency of the State of Tennessee designated by TNDOE to hear special education due process hearing requests ("due process complaints") pursuant to 20 U.S.C. §1415(f) and T.C.A. §49-10-606. APD has its principal place of business located at 312 Rosa L. Parks Avenue, 8th Floor, Snodgrass Tower, Nashville , Tennessee 37243-1102.

15.     Defendant Elizabeth D. Cambron, Administrative Law Judge ("ALJ Cambron") is a Tennessee Administrative Law Judge ("ALJ") employed by the APD to hear cases, including special education cases. ALJ Cambron is a "hearing officer" as that term is defined in IDEA, 20 U.S.C. §1415(f)(3)(A) and 34 C.F.R. §300.511(c), and must meet the requirements of those sections. ALJ Cambron was the hearing officer assigned to the underlying DP Case and also hears numerous

other special education due process cases. ALJ Cambron is named herein in her official capacity.

16. Thomas G. Stovall, Administrative Law Judge ("ALJ Stovall") is a Tennessee ALJ employed by the APD to hear cases, including special education cases. ALJ Stovall is a "hearing officer" as that term is defined in IDEA, 20 U.S.C. §1415(f)(3)(A) and 34 C.F.R. §300.511(c), and must meet the requirements of those sections. ALJ Stovall was the hearing officer assigned to the underlying DP Case and also hears numerous other special education due process cases. ALJ Stovall is named herein in his official capacity.

## STANDARD OF REVIEW OF ADMINISTRATIVE DECISION

17. In an IDEA action, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

18. The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give "due weight" to the determinations made during the state administrative process. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

19.     Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe ex rel. Doe v. Metropolitan Nashville Public Schools*, 133 F.3d 384, 387 (6th Cir. 1998), neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review." *Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 624 (6th Cir. 1990).

20.     The amount of weight due to administrative findings depends on whether the finding is based on educational expertise. *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation." *Id.* "More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant." *Id.*

21.     According to this "modified de novo" standard of review, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001).

22.     The *de novo* standard of review is applied to conclusions of law and a "clearly erroneous" standard of review to findings of fact. *Knable, supra.* Mixed

questions of law and fact, including the question of whether a child was denied a FAPE, are reviewed *de novo*. *Id.* at 766.

## FEDERAL STATUTORY OVERVIEW

23.    IDEA guarantees that every child with a disability receives a Free Appropriate Public Education ("FAPE") from his public school if that school receives federal funding.  20 USC §1412(a)(1)(A).

24.    The U.S. Supreme Court has defined FAPE as requiring that a disabled student's "educational program must be <u>appropriately ambitious</u> in light of his circumstances. . . . this standard is <u>markedly more demanding than the 'merely more than de minimis' test.</u>"  *Endrew F v. Douglas County School Dist. RE-1*, 137 S. Ct. 988, 1000, 580 US __, 197 L. Ed. 2d 335 (2017) (emphasis added.)

25.    The U.S. Supreme Court has held that it is not only the child with the disability that has legal rights under IDEA, but the parents of that child are also entitled to assert legal rights on their own behalf under IDEA.  *Winkelman v. Parma City School Dist.*, 550 U.S. 516, 127 S.Ct. 1994, 1996 (2007) ("Parents enjoy rights under IDEA; and they are, as a result, entitled to prosecute IDEA claims on their own behalf. The decision by Congress to grant parents these rights was consistent with the purpose of IDEA and fully in accord with our social and legal traditions.")

26.     One of the stated purposes of IDEA is "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. §1400(d)(1)(B).

**Development of the IEP**

27.     The State Educational Agency ("SEA")[2], TNDOE herein, and the Local Educational Agency ("LEA")[3], SCS herein, provide a child with a disability a FAPE through an Individualized Education Program ("IEP")[4] developed by an IEP Team.  20 U.S.C. §1414(d)(1); *see also Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005).

---

[2] 20 U.S.C. §1401(32) The term "State educational agency" means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law.

[3] 20 U.S.C. §1401(19) The term "local educational agency" means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.

[4] 20 U.S.C. §1401(14) The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title.

28. The IEP is "the centerpiece of the [IDEA]'s education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

29. A LEA or SEA must have an IEP in effect for each child with a disability in the agency's jurisdiction at the beginning of each school year. 20 U.S.C. §1414(d)(2)(A).

30. The IEP must state the student's educational status, the annual goals for the student's education, the special educational services and aides to be provided to meet those goals, and the extent the student will spend time in school environments with non-disabled students. 20 U.S.C. §1414(d)(1)(A).

31. Every IEP written for a student with a disability must contain "a statement of the child's present levels of academic achievement and functional performance." 20 U.S.C. §1414(d)(1)(A)(i)(I). This is known as the "PLAAFP".

32. The PLAAFP must include a statement of "how the child's disability affects the child's involvement and progress in the general education curriculum." 20 U.S.C. §1414(d)(1)(A)(i)(I).

33. A team of people work cooperatively to formulate the IEP. This "IEP Team" comprises the student's parents or guardian; a school district representative; the student's regular and special education teachers; a person able to interpret the

student's results and evaluations; and, when appropriate, the student. 20 U.S.C. §1414(d)(1)(B).

**Parental Participation in the Education of Their Child With a Disability**

34.     Congress wrote specific provisions into IDEA to implement the goal of parental participation.

35.     One of those provisions is "an opportunity for the parents of a child with a disability . . . to participate in meetings with respect to the identification, evaluation, and educational placement of the child." 20 U.S.C. §1415(b)(1) (emphasis added.)

36.     The parents of a child with a disability are mandatory members of the IEP Team. 20 U.S.C. §1414(d)(1)(B)(i). Indeed, "the concerns of the parents for enhancing the education of their child" is critical in developing the child's IEP. 20 U.S.C. §1414(d)(3)(A)(ii); *see also Honig v. Doe*, 484 U.S. 305 (1988); *Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005) (Parents play "a significant role" in the development of each child's IEP.)

37.     Parental participation in an IEP meeting is so vital, it is set forth twice in the IDEA regulations. 34 C.F.R. §§300.322(a), (c) and (d) (emphasis added); 34 C.F.R. §300.501(b)(1).

38.     Another provision is a parent's opportunity to challenge an IEP placement either through mediation or a complaint, at their option.  20 U.S.C. §§1415(b)(5) and (6).

**Evaluations / IEEs**

39.     A LEA has a continuing duty under IDEA to assess a student in "all areas of suspected disability."  20 U.S.C. §§1414(a)(1)(A) and (b)(3)(B) ("Each local educational agency shall ensure that . . . the child is assessed in all areas of suspected disability"); *see* 34 C.F.R. §300.304(c)(4) ("The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities"); and 34 C.F.R. §300.304(c)(6) ("In evaluating each child with a disability . . . the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.")  This is known as the "Child Find" obligation or obligation to evaluate.

40.     An IEP must address all of the student's needs.  *See, Letter to Clarke*, Mar. 8, 2007, U.S. Department of Education Office of Special Education and Rehabilitative Services ("USOSERS") Guidance.

41.    "A local educational agency shall ensure that a reevaluation of each child with a disability is conducted . . . if the child's parents or teacher requests a reevaluation."  20 U.S.C. §1414(a)(2)(A)(ii).

42.    Periodic evaluations are conducted to ensure that the PLAAFP is accurate.  20 U.S.C. §1414(d)(3)(A).

43.    Parents may obtain Independent Educational Evaluations ("IEEs") using their own selected providers. 34 C.F.R. §300.502.  If parents provide such IEEs to the school district,  they "[m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child."  34 C.F.R. §300.502(c)(1) (emphasis added.)

44.    The evaluation procedures under IDEA have very stringent requirements and methodologies.  20 U.S.C. §§1414(b)(2) and (3).

45.    Evaluations are not simply the opinions of members of the IEP Team or school staff, but rather a scientific testing methodology.  "In conducting the evaluation, the local educational agency shall use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent (to determine if there is a disability and what will be necessary in an IEP); shall not use any single measure or assessment as the sole criterion for determining (disability or the education program); and use technically sound instruments that may assess the relative

contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. §1414(b)(2).

46.    A teacher "assessment" or "screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation <u>shall not be considered to be an evaluation</u> for eligibility for special education and related services."  34 C.F.R. §300.302 (emphasis added.)

47.    "Every LEA shall develop a policy setting forth the rights of parents and students and guidelines for teachers and principals with respect to the administration of surveys, analyses or evaluations of students. The policy . . . shall allow a parent or legal guardian access to review all surveys, analyses or evaluations, prior to being administered to the parent or legal guardian's child." T.C.A. §49-2-211.

**Extended School Year (ESY) Services**

48.    "Each public agency must ensure that extended school year services are available as necessary to provide FAPE" to a student with a disability if there is a likelihood of regression.  34 C.F.R. §300.106.

49.    "[T]he term extended school year services means special education and related services that are provided to a child with a disability beyond the normal school year of the public agency; in accordance with the child's IEP; and at no cost to the parents of the child."  34 C.F.R. §300.106(b)(1).

50.    "ESY is necessary to avoid regression so severe that the child would not be able to catch up during the following school year." *Board of Educ. of Fayette County, Ky. v. LM*, 478 F.3d 307, 315 (6th Cir. 2007) *citing Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990).

**Reimbursement for Unilateral Private Placement**

51.    Under IDEA, parents of a child with a disability, who previously received special education and related services from a public agency, may remove such child from the public school and place the child in a private placement without the consent of such public school.  20 U.S.C. §1412(a)(10)(C) (private placement includes "private school or facility"); *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

52.    "[A] court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment."  20 U.S.C. §1412(a)(10)(C)(ii).

53.    The U.S. Supreme Court held that parents initially seeking reimbursement for a private placement carry the burden of proving (1) that the public placement violated IDEA, and (2) that the private placement was proper under the act.  *Florence County School District Four v. Carte*r, 510 U.S. 7, 15 (1993); *see also Schaffer*, 546 U.S. at 58; *Deal v. Hamilton County Bd. of Educ.*,

392 F.3d 840, 855 (6th Cir. 2004) ("Parents may receive retroactive reimbursement for private educational services they unilaterally provide to their child . . . if [the above *Carter* test is met].")

**Procedural Safeguards**

54.     IDEA guarantees parents and their child with a disability numerous legal rights identified as "Procedural Safeguards".  *See* 20 U.S.C. §1415.

55.     SEAs and LEAs are required to "establish and maintain procedures in accordance with this section to ensure that children with disabilities and their <u>parents are guaranteed procedural safeguards</u> with respect to the provision of a free appropriate public education by such agencies."  20 U.S.C. §1415(a) (emphasis added.)

56.     SEAs, such as TNDOE, "must have in effect the policies and procedures, including sanctions that the State uses, to ensure that its policies and procedures [IDEA's regulations] are followed and that the requirements of the Act and the regulations in this part are met."  34 C.F.R. §300.626.

**Parents' Rights in a Due Process Hearing / 45 Day Rule**

57.     One of IDEA's key Procedural Safeguards guaranteed is "[a]n opportunity for any party to present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the

provision of a free appropriate public education to such child." 20 U.S.C. §1415(b)(6) ("due process complaint").

58.    From the date of filing the due process complaint, the parties have thirty (30) days within which to settle or otherwise resolve the dispute. 20 U.S.C. §1415(f)(1)(B)(ii). This is known as the "30 Day Resolution Period".

59.    "Day" within the meaning of IDEA is a calendar day and does not exclude weekends or holidays. 34 C.F.R. §300.11(a).

60.    IDEA provides three options for the parties during the 30 Day Resolution Period, namely, mediation, 20 U.S.C. §1415(e); a resolution meeting, 20 U.S.C. §1415(f)(1)(B); or a waiver of both, 20 U.S.C. §1415(f)(1)(B)(i)(IV); *see also* 34 C.F.R. §300.510(a).

61.    The parties may agree to extend the 30 Day Resolution Period. 34 C.F.R. §300.510(c).

62.    The purpose of the "30 Day Resolution Period" is to settle the case before the parties have to go to a very rapid hearing process.

63.    The "resolution period" totals 30 days and if the case is not resolved, it proceeds to hearing. 20 U.S.C. §1415(f)(1)(B)(ii) ("If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of

the applicable timelines for a due process hearing under this subchapter shall commence"); 34 C.F.R. §300.510(b)(1).

64.     After termination of the 30 Day Resolution Period, a final decision must be rendered in the due process case within forty-five (45) days. 34 C.F.R. §300.515(a) ("The public agency must ensure that not later than 45 days after the expiration of the 30 day period . . . A final decision is reached in the hearing;" emphasis added.) This is commonly referred to as the "45 Day Rule".

65.     The timeline for the 45 Day Rule begins at the expiration of the 30 Day Resolution Period. 34 C.F.R. §§300.510(b)(2) and (c).

66.     A hearing officer may grant specific adjournments beyond the 45 days "at the request of either party." 34 C.F.R. §300.515(c) (emphasis added.) This is known as the "Adjournment Rule".

67.     There is no statutory or regulatory authority permitting a hearing officer to *sua sponte* grant an adjournment. *See* 34 C.F.R. §300.515(c).

68.     Parents in a special education due process hearing have a right to "[p]resent evidence and confront, cross-examine, and compel the attendance of witnesses." 34 C.F.R. §300.512(a)(2).

69.     If parents obtain an IEE at their own expense and share the results with the LEA, the IEE report "[m]ay be presented by any party as evidence at a

hearing on a due process complaint . . . regarding that child." 34 C.F.R.

§300.502(c)(2).

**Requirements of Due Process Hearing Officers**

70.    A hearing officer conducting a special education due process hearing

"shall, at a minimum not be (I) an employee of the State educational agency or the

local educational agency involved in the education or care of the child; or (II) a

person having a personal or professional interest that conflicts with the person's

objectivity in the hearing."  20 U.S.C. §1415(f)(3)(A)(i).

71.    In addition, a special education due process hearing officer "shall, at a

minimum possess knowledge of, and the ability to understand, the provisions of

this chapter, Federal and State regulations pertaining to this chapter, and legal

interpretations of this chapter by Federal and State courts; possess the knowledge

and ability to conduct hearings in accordance with appropriate, standard legal

practice; and possess the knowledge and ability to render and write decisions in

accordance with appropriate, standard legal practice."  20 U.S.C.

§§1415(f)(3)(A)(ii) – (iv).

**Parents' Rights to Review Their Child's Records**

72.    Another IDEA Procedural Safeguard is that parents of a child with a

disability <u>shall</u> be given an "opportunity . . . to examine all records relating to such

child."  20 U.S.C. §1415(b)(1).

73.     A LEA shall comply with the parents' right to examine records "without unnecessary delay" and prior to a Due Process hearing and "in no case more than 45 days after the request has been made."  34 C.F.R. §300.613(a).

**Administrative Decisions and Remedies**

74.     For allegations of substantive denials of FAPE, "a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education."  20 U.S.C. §1415(f)(3)(E)(i).  This applies the *Endrew F* standard.

75.     "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits." 20 U.S.C. §1415(f)(3)(E)(ii); *see Deal v. Hamilton County Bd. of Educ.,* 392 F. 3d 840, 854 (6th Cir. 2004).

76.     Procedures used to develop an IEP must be strictly reviewed, although technical deviations do not render an IEP invalid. *Deal,* 392 F. 3d at 854.

77.     When there is a finding of denial of FAPE, a hearing officer or court "shall grant such relief as the court determines is appropriate."  20 U.S.C. §1415(i)(2)(C)(iii).

78.     IDEA is a fee-shifting statute, whereby if parents are prevailing

parties (at any stage of the dispute) "the court, in its discretion, may award

reasonable attorneys' fees as part of the costs" in their favor.  20 U.S.C.

§1415(i)(3)(B)(i).

79.     If a court finds that the SEA or LEA unreasonably protracted the final

resolution of the special education due process case or there was a violation of

IDEA's procedural safeguards, the court may <u>not</u> reduce the "amount of the

attorneys' fees awarded" under IDEA, including violation of the 45 Day Rule.  34

C.F.R. §300.517(c)(5); *see also Letter to Anderson*, U.S. Department of Education

Office of Special Education and Rehabilitative Services, November 10, 2010.

## <u>TENNESSEE REGULATORY SCHEME FOR SPECIAL EDUCATION</u>

80.     Tennessee has established a regulatory scheme for special education

and disputes.  *See* TN Special Education Rules[5] §0520-01-09-.01 *et seq.*

81.     The TN SER incorporate by reference IDEA regulations in their

entirety.  §0520-01-09-.01.

82.     There are no other Tennessee rules that apply to special education

cases.  *See* TN Uniform Rules of Procedure for Contested Cases §1360-04-01-

.01(1) ("these rules shall govern contested case proceedings before all agencies . . .

---

[5] Hereinafter "TN SER".

except where an agency has lawfully adopted a rule pursuant to T.C.A. §4-5-219 (d).")

83.     An LEA is required to provide FAPE and meet its "Child Find" obligation.  TN SER §§0520-01-09-.05 and -.06.

84.     Homebound placements are contemplated and provided for in the TN SER. §0520-01-09-.07.  "The IEP team shall consider a medical homebound placement only upon certification by a licensed doctor of medicine or osteopathy that a child with a disability needs a homebound placement, is expected to be absent from school due to a physical or mental condition for at least (10) consecutive school days and that the child can receive instruction in a homebound placement without endangering the health of personnel providing it."  TN SER §0520-01-09-.07(2)(b).

85.     TNDOE is responsible for monitoring and enforcing IDEA, its regulations, and the TN SER on LEAs.  TN SER §0520-01-09-.09.

86.     TN SER provides for parental participation and indicates that IEPs may not be predetermined before IEP meetings.  TN SER §0520-01-09-.15.

**Special Education Dispute Resolution**

87.     Mediation is one method provided in the TN SER to resolve special education disputes and must be conducted by mediators from the Alternative Dispute Resolution Commission, who must also receive training in special

education law.  All parties must participate in good faith.  TN SER §0520-01-09-.17.

88.     Impartial due process hearings for special education cases are governed by TN SER §0520-01-09-.18.

89.     TNDOE has designated Administrative Law Judges ("ALJs") from the Secretary of State to hear special education due process cases.  TN SER §0520-01-09-.18(1).

90.     TN SER is silent on "discovery" or other procedural rules in special education impartial due process hearings.  *See*, TN SER §0520-01-09-.18.

91.     The reason for this silence is to ensure that special education cases are either resolved within the 30 Day Resolution Period or a decision is issued in compliance with the federal 45 Day Rule.

**Requirements of Administrative Law Judges**

92.     "The administrative office of the courts shall provide legal training in special education law to the administrative law judges assigned to hear special education due process cases sufficient to comport with the requirements of 20 U.S.C. § 1415, as from time to time amended."  TN SER §0520-01-09-.18(1).

93.     "[T]he Tennessee Code of Judicial Conduct, Rule 10, Canons 1 through 4, of the Rules of the Tennessee Supreme Court, and any subsequent amendments thereto, shall apply to all administrative judges and hearing officers of

the State of Tennessee." TN Uniform Rules of Procedure for Contested Cases ("TN URP") §1360-04-01-.20. This is true even when an agency has adopted their own rules, such as the TN SER. TN URP §1360-04-01-.01(1).

94.     The impartiality required under IDEA is similar to and related to the standard for disqualifying a judge. "A judge shall disqualify himself or herself in any proceeding in which <u>the judge's impartiality might reasonably be questioned</u>, including but not limited to the following circumstances: (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding; (2) The judge knows that the judge, the judge's spouse or domestic partner, or a person within the third degree of relationship to either of them, or the spouse or domestic partner of such a person is . . . (c) <u>a person who has more than a *de minimis* interest that could be substantially affected by the proceeding</u>; . . . (3) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, domestic partner, parent, or child, or any other member of the judge's family residing in the judge's household, <u>has an economic interest in the subject matter in controversy </u>or is a party to the proceeding." Tenn. Sup. Ct. R. 10, RJC 2.11(A) (emphasis added.)

## ABOUT TNDOE

95.     States can receive federal funding for special education "if the State submits a plan that provides assurances to the [U.S. Secretary of Education] that

the State has in effect policies and procedures <u>to ensure that the State meets each of the following conditions</u>: Free Appropriate Public Education ("FAPE") is available to all children with disabilities residing in the State between the ages of 3 and 21 . . . Children with disabilities and their <u>parents are afforded the procedural safeguards</u> required by section 1415 of this title" among other rights. 20 U.S.C. §1412(a)(6)(A) (emphasis added.)

96. "Any <u>State educational agency</u>, <u>State agency</u>, or <u>local educational agency</u> that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section <u>to ensure that children with disabilities and their parents are guaranteed procedural safeguards</u> with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. §1415(a) (emphasis added.)

97. Upon information and belief, TNDOE has submitted a plan to the United States Secretary of Education ensuring that it has procedural safeguards in place for children with disabilities in the State of Tennessee.

98. TN DOE is an executive branch agency of the State of Tennessee.

99. TNDOE receives federal funds pursuant to IDEA, 20 U.S.C. §1412, and therefore must comply with the statute's provisions.

100. As SEA, TNDOE is mandated to ensure that all LEAs, including SCS, comply with the requirements of IDEA. 20 U.S.C. §1412(a)(11)(A).

101. "In a suit against a State for a violation of [IDEA], remedies (including remedies both at law and in equity) are available for such a violation to the same extent as those remedies are available for such a violation in the suit against any public entity other than a State." 20 U.S.C. §1403(b).

## **ABOUT THE APD**

102. APD "provides professional administrative judges to resolve disputes between citizens and governmental agencies in an impartial manner." (From the APD website, https://sos.tn.gov/apd, as of July 30, 2020[6].)

103. The Tennessee Secretary of State and therefore its subdivision APD is an Executive Branch agency.

104. TNDOE has designated APD as the agency to conduct the administrative hearing for special education disputes. (*See supra* ¶89.)

105. APD hears cases for most state agencies, including special education due process cases for the TNDOE. Thus, APD has a substantial docket covering most of the Tennessee executive branch agencies. APD is not dedicated solely to handling cases arising under IDEA or other similar statutes which provide legal rights to children with disabilities and their families.

106. The ALJs and the APD are unable to grant brief adjournments, for e.g. illness of a party or witness, death in the family, or schedule conflict of a party,

---

[6] Hereinafter, "APD website".

because of the APD system. Adjournments are typically for several months because of the individual ALJ's or the APD's schedule.

107. In addition, most ALJs presiding over special education due process cases require post-hearing briefing, which is not contemplated in either IDEA or the TN SER and which only further delays issuance of the final decision in the case, exacerbating the violation of the 45 Day Rule.

108. The APD has a very limited jurisdiction. "Administrative law judges shall have jurisdiction to hear complaints arising under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, et seq., as from time to time amended, and Rules of the State Board of Education." TN SER §0520-01-09-.18(1).

109. Thus, the APD refuses to handle §504 or ADA special education claims, including retaliation claims, despite the requirements of exhaustion. *See* 20 U.S.C. §1415(l); *Fry*, *supra*.

110. Upon information and belief, the ALJs do not receive and APD does not provide adequate impartial training or instruction on IDEA law, specifically the rigors of the 45 Day Rule, and do not meet IDEA's requirements for hearing officers.

111. Upon information and belief, the training provided by the APD to ALJs on IDEA law was and is provided by SCS's former and current counsel,

skewed in favor of TNDOE, LEAs, and school districts creating a false
understanding of special education law and the applicable rules to due process
cases.

112. As a direct and proximate result of the training provided by the APD
to ALJs on IDEA law, the ALJs are not properly informed on IDEA and special
education law and therefore do not meet IDEA's requirements for hearing officers.

## THE PRACTICAL EFFECTS OF TNDOE'S APPOINTMENT OF THE APD AS ARBITERS OF SPECIAL EDUCATION DISPUTES

113. USOSERS tracks data on its website as to compliance by SEAs with
IDEA. The following chart summarizes special education disputes in the State of
Tennessee resolved within the 45 Day Rule:[7]

| YEAR | # DP Cases Decided within 45 Day Rule | # DP Cases pending at end of year | % Decided within 45 Day Rule |
|---|---|---|---|
| 2013-14 | 1 | 10 | 9.1% |
| 2014-15 | 0 | 10 | 0.0% |
| 2015-16 | 1 | 9 | 10.0% |
| 2016-17 | 0 | 19 | 0.0% |
| 2017-18 | 1 | 5 | 16.7% |
| 2018-19 | n/a | n/a | |

114. Perhaps more disturbing is the following chart showing the percentage
of cases withdrawn or dismissed out of the total special education due process
cases filed in Tennessee since 2013-14:[8]

---

[7] Source: USDOE OSEP Technical Assistance on State Data Collection,
https://www2.ed.gov/programs/osepidea/618-data/static-tables/index.html

[8] Source: *see fn. 7.*

| YEAR | # DP Cases Filed | # DP Withdrawn or Dismissed | % Withdrawn or Dismissed |
|---|---|---|---|
| 2013-14 | 62 | 51 | 82% |
| 2014-15 | 56 | 46 | 82% |
| 2015-16 | 65 | 55 | 85% |
| 2016-17 | 82 | 63 | 77% |
| 2017-18 | 54 | 48 | 89% |
| 2018-19 | n/a | n/a | |

The reason for the withdrawal or dismissal is not provided in the data. Upon information and belief, however, cases are withdrawn by parents who do not have the resources to fight a long litigation battle, *e.g.* discovery, motions, etc., compared to the well-funded school districts and their counsel.

115. The data shows that despite the federal and state law requirements that special education cases brought pursuant to IDEA should be decided within 45 days after the 30-day resolution period, final decisions in most cases filed in Tennessee were not issued in compliance with the 45 Day Rule.

116. Upon information and belief, TNDOE has not been in compliance with the 45 Day Rule since at least 2013.

## FACTUAL BACKGROUND

117. As a child with a disability, D.T. was first deemed eligible by SCS school district in 2013 and reconfirmed eligibility in 2015.

118. For the 2016-17 school year, Plaintiffs enrolled D.T. in kindergarten at the Goodpasture Christian School, a private school, in Madison, Tennessee, where he was supported throughout the day by a 1:1 aide. D.T. also received 1:1

Speech and Language Therapy twice per week at Goodpasture. D.T. received 1:1 Applied Behavior Analysis (ABA) therapy for approximately (3) hours each afternoon in his home, both of which were paid for by Plaintiffs.

119. By winter / spring of 2017, it became evident to Plaintiffs and the staff at Goodpasture that D.T. was not making appropriate progress in that placement.

120. In March 2017, Plaintiffs transferred D.T.'s enrollment to The Edison School, a private school, in Gallatin, Tennessee. The Edison School serves children with "specific learning differences and unique learning styles". At The Edison School, D.T. was in a kindergarten classroom with two (2) other children who also have diagnosed learning disabilities.

121. Unfortunately, even in a small group setting, D.T. was unable to make appropriate, meaningful progress at The Edison School.

122. Plaintiffs concluded that neither The Edison School nor Goodpasture is an appropriate least restrictive environment ("LRE") for D.T.

123. The only documented progress D.T. made during the 2016-2017 academic year was through his 1:1, home-based ABA program that he attended after school. Plaintiffs continued to fund D.T.'s 1:1 ABA/Speech Language program at their own expense, while planning to seek guidance from D.T.'s therapists and physicians.

124. During the summer of 2017, Plaintiffs made an appointment for D.T. with Developmental Pediatrician Cecelia McCarton, M.D. ("Dr. McCarton"), during which a psychoeducational evaluation was conducted. The results of this testing were disappointing to Dr. McCarton and to Plaintiffs and affirmed their concerns that D.T. did not make adequate progress in his educational placements of Goodpasture and The Edison School. Dr. McCarton also expressed concerns about D.T. presenting signs of another disorder, common among children with Autism, called Central Auditory Processing Disorder (CAPD). Dr. McCarton made numerous recommendations for an appropriate educational program for D.T.

125. Heeding Dr. McCarton's advice, D.T.'s parents immediately increased the number of hours of D.T.'s home-based, 1:1 ABA and Speech/Language program to approximately (30) hours per week at their own expense, recognizing that D.T. would continue to be at serious educational and developmental risk if he was to return to The Edison School.

126. D.T.'s parents are not educators and did not feel competent to administer a homeschool program that would meet D.T.'s needs.

127. D.T.'s parents planned to contact SCS to seek out an appropriate Individualized Educational Program ("IEP") for D.T. pursuant to the public school agency's obligation to provide children with a disability a Free Appropriate Public Education ("FAPE") under IDEA.

128. In September 2017, Plaintiffs paid for an auditory processing evaluation for D.T., which confirmed D.T.'s diagnosis of a Central Auditory Processing Disorder ("CAPD").

129. On September 27, 2017, D.T.'s parents contacted Jessica Thurman, Principal of Vena Stuart Elementary, D.T's designated home school within SCS school district, requesting an IEP meeting to discuss developing and implementing an IEP for D.T. based on Dr. McCarton's recommendations. As part of their request, Plaintiffs submitted Dr. McCarton's report, a recent Speech/Language evaluation, the CAPD evaluation, and an ABLLS-R evaluation conducted by Board Certified Behavior Analyst Sarah Micklewright ("Micklewright").

130. An IEP meeting was held on October 18, 2017, during which SCS fully accepted the private evaluations submitted by Plaintiffs. Micklewright was present at this meeting at Plaintiffs' expense.

131. SCS conducted no evaluations. SCS only sought consent to conduct curriculum-based measurements and observations and Plaintiffs consented.

132. During the 10/18/17 IEP meeting, D.T.'s parents were encouraged to bring D.T. to school the next day. Karen Shoulders, Special Education Coordinator, said: "We can offer him a free, appropriate, public education tomorrow if you'll just bring him to school." D.T.'s mother responded, "You want me to bring him to school without an IEP in place?" Special Education Teacher

Rachel Nuckolls ("Nuckolls") replied, "We do that all the time!" D.T.'s mother repeated, "You have children start school without an IEP?" To which Nuckolls replied in the affirmative.

133. During the same 10/18/17 IEP meeting, D.T.'s parents requested that SCS's staff observe D.T.'s 1:1 home-based ABA/Speech Language program. Plaintiffs also requested that they be allowed to inspect the testing instruments for the curriculum-based measurements pursuant to T.C.A. §49-2-211(b)(1) prior to testing by SCS. Plaintiffs also requested a copy of the policy regarding the testing protocols, specifically parental observation of testing. None of these requests were granted, nor were reasons for the denials offered.

134. Karen Shoulders ("Shoulders"), a Speech/Language therapist and Special Education Coordinator for SCS, kept minutes of the 10/18/17 IEP meeting.

135. Following the meeting, Plaintiffs submitted corrections and revisions for such meeting minutes to Julie Daniel ("Daniel"), Special Education Coordinator for SCS, but SCS neither incorporated such changes nor responded to Plaintiffs' submissions.

136. On October 20, 2017, Melanie Webster ("Webster"), SCS's Attendance Supervisor and Special Education Coordinator for Preschool, sent an email threating Plaintiffs with truancy charges regarding D.T.'s attendance at SCS. Webster was aware of Plaintiffs' contacts with SCS to develop an IEP for D.T. and

continuing home-based services funded by Plaintiffs. Webster was also aware of Plaintiffs' willingness to enroll D.T. in SCS once an appropriate IEP was put in place.

137. Webster had also previously interacted with D.T.'s parents in preschool IEP meetings. During this process, Webster, as the representative of SCS, willfully misled Plaintiffs as to the recommended preschool placement for D.T. and allowed Plaintiffs' outside therapists to visit the school for observation at Plaintiffs' expense. However, at a subsequent meeting, Webster revealed that a different class would be D.T.'s placement. This was a deliberate deception by SCS's representative and Plaintiffs expressed their frustration to Webster about the missed educational opportunities for D.T. Webster did not apologize or offer any remedies for her error deception.

138. In response to Webster's threats of truancy charges and to placate enrollment requirements during the IEP development process, D.T.'s parents submitted paperwork on October 21, 2017 simultaneously enrolling D.T. in SCS and making a referral for homebound educational services to be offered in conjunction with D.T.'s existing home-based 1:1 therapy program. With this submission, Plaintiffs also provided a letter from D.T.'s physician stating that he should not be removed from his current home-based ABA program until another

appropriate educational plan could be developed, since doing so could result in "permanent damage to his growth and development".

139.   On October 23, 2017, Daniel responded to Plaintiffs that Kim Brown, the homebound teacher, was out due to a death in the family, but that a homebound services request would be emailed to the parents right away. That paperwork was sent to D.T.'s parents on October 24, 2017. It was completed by D.T.'s parents and returned to the school. D.T.'s parents also offered to pick up assignments from the school until homebound services could be implemented.

140.   On October 24, 2017, four members of SCS's staff observed D.T.'s home-based 1:1 ABA program for a period of two (2) hours collectively. SCS did not send a BCBA or Autism Specialist to this observation. During each hour period, observers were able to witness Micklewright successfully work with D.T. on numerous goals.  D.T.'s parents were not given a copy of the home observation report until after November 13, 2017.

141.   On or about October 27, 2017, curriculum-based measurements and observations of D.T. were conducted by SCS at Vena Stuart Elementary. Upon their completion, D.T.'s parents requested that the results be shared with them as soon as possible so that an IEP meeting could be scheduled.

142.   SCS offered November 13, 2017 as the first available date for an IEP meeting.

143.   Having received no calls regarding assignments to pick up for D.T. or any information about homebound services in general, D.T.'s parents contacted Daniel to inquire about the status on November 6, 2017.  In response, Daniel said that SCS's position is that Plaintiffs' request for homebound services did not indicate a medical necessity for such services and that such services are only provided on a temporary basis and because of medical necessity, with the goal of returning the student to a less restrictive environment. SCS said that placement was left for discussion during the November 13, 2017 IEP meeting.  Thus, SCS had predetermined that homebound services were not appropriate for D.T. prior to any discussion at an IEP meeting.

144.   Throughout this process, Webster continued to threaten Plaintiffs with truancy charges.

145.   Throughout this process, Plaintiffs repeatedly asked Daniel for assistance in dealing with the Attendance Department's truancy threats as they continued to work toward an appropriate IEP.  Daniel refused each of these requests.

146.   Plaintiffs continued to communicate with SCS's Attendance Department to notify them of D.T.'s continuing home program and that they were moving the IEP process along as quickly as they could.

147. On numerous occasions, D.T.'s mother requested a copy of the policy that outlines the appeals procedure for unexcused absences as outlined in state law. Webster refused to produce any such document to Plaintiffs. Eventually, Webster admitted that no such policy exists.

148. Despite the recommendation from D.T.'s physician that he remain in his home-based program until an appropriate IEP could be developed and implemented, Webster proposed in a November 8, 2017 email that Plaintiffs "1. Enroll in Independent Home School. 2. Attend Vena Stuart Elementary with strategies shared with his teacher regarding methods that are successful with D.T." SCS's proposal essentially places the responsibility for FAPE in Plaintiffs' hands in violation of IDEA.

149. After D.T.'s parents had sent numerous emails inquiring about the homebound placement, Daniel sent an email referencing the fact that homebound placement for students eligible for IEPs are decided by the IEP team under Tennessee's Special Education Regulations. If D.T. did not have access to his home-based 1:1 program provided by therapists at the expense of Plaintiffs, he would have sustained 15 school days without educational opportunity of any kind. It is also important to note that D.T.'s mother followed the exact procedure outlined on SCS's website regarding the process for referral for Homebound Services.

150. An IEP meeting was held for D.T. on November 13, 2017 (the "11/13/17 IEP meeting").

151. During the 11/13/17 IEP meeting, the IEP team incorporated the evaluations previously submitted by Plaintiffs to establish Present Levels of Academic and Functional Performance ("PLAAFP") and formation of goals, but SCS's members of the IEP team completely ignored the explicit recommendations regarding placement made by Dr. McCarton and Micklewright. The home-based 1:1 ABA program is appropriate and successful for D.T.

152. Also, during the 11/13/17 IEP meeting, D.T.'s mother submitted an annotated IEP form indicating the changes and deletions that she was requesting as part of her Parental Concerns document, but these were not included in the IEP.

153. D.T.'s mother requested Prior Written Notice ("PWN") on why the recommended 1:1 ABA program request was denied. SCS issued a PWN without addressing the refusal to provide the 1:1 ABA/Speech-Language program.

154. Shoulders took meeting minutes of the 11/13/17 IEP meeting. D.T.'s mother submitted requested revisions to these notes to Daniel, but SCS refused to amend same and offered no response thereto.

155. D.T.'s mother also submitted all of the goals that Micklewright was working on with D.T. at that time and asked that they be included in the IEP.

156. Additionally, the prevocational skills checklist that was used by SCS for prevocational PLAAFP on the IEP was not given to D.T.'s parents at the 11/13/17 IEP meeting. Plaintiffs only received a copy of it on November 30, 2017 after having to request it from Daniel.

157. Following the 11/13/17 IEP meeting, Plaintiffs contacted Daniel to request an opportunity for them and Micklewright to observe the proposed setting at Vena Stuart Elementary.

158. On November 21, 2017, the requested observation of Vena Stuart Elementary took place for a period of one hour as per school policy by Micklewright and D.T.'s mother. Micklewright found that, in her professional opinion, the settings did not look appropriate for D.T.

159. Due to SCS's continued threats of truancy charges and its denial of the homebound placement for D.T., D.T.'s parents allowed him to begin attending Vena Stuart Elementary on November 27, 2017.

160. The IEP team met again on December 5, 2017 (the "12/5/17 IEP meeting").

161. At the 12/5/17 IEP meeting, SCS had its attorney Melinda Jacobs attend to collect information. Her presence had a chilling effect on D.T.'s parents' participation in the meeting.

162. SCS refused to include all of the goals requested by D.T.'s parents. SCS refused to honor the recommendations set forth in the parent-provided evaluations.

163. The services offered in the 12/5/17 IEP did not meet the duration of opportunities (number of engaged, 1:1 hours), density of opportunity (number of opportunities per hour), expertise (no direct instruction by BCBA and/or program/therapist oversight by a BCBA), quality of goals (goals included many previously taught/previously mastered skills), fidelity of implementation (accepted reliance on prompts would not demonstrate goal mastery), among other items, to be reasonably calculated for D.T. to make appropriately ambitious progress in light of his circumstances.

164. Because of the continued threats of truancy charges by SCS, on December 13, 2017, Plaintiffs consented to the 12/5/17 IEP and SCS's offer of FAPE with multiple objections noted, not least of which is that the 12/5/17 IEP was inadequate to meet D.T.'s needs.

165. Plaintiffs continued to assert that the home-based program was appropriate and that D.T. was making progress therein.

166. Plaintiffs reduced D.T.'s 1:1 ABA/Speech-Language therapy at home from approximately 30 hours/week to 2 hours/week when D.T. started at Vena

Stuart Elementary on November 27, 2017. The two hours per week was continued for monitoring progress or regression.

167. During the 67 calendar days from November 27, 2017 until February 2, 2018 while at Vena Stuart Elementary, D.T. sustained "staggering regression", including loss of speech, loss of mastered skills, increased echolalia and scripting, and, alarmingly, a never-before-seen presentation of aggressive and maladaptive behaviors in the home environment, as evidenced by video footage, data collected during that time, and parent and therapist reports.

168. At or about that time, Plaintiffs removed D.T. from Vena Stuart Elementary and transferred him to Hope Autism and Behavioral Health Services in Nashville, Tennessee, a private facility paid for by Plaintiffs. Plaintiffs provided SCS with the required 10 days' notice of the change in placement and that they would be seeking reimbursement for same from SCS.

169. SCS replied that it was standing behind the 12/5/17 IEP as offered with no changes or improvements.

170. Despite expressed concerns by Dr. McCarton about potential regressions by D.T. without 12 month continuous services, SCS also denied Plaintiffs' request for Extended School Year ("ESY") services during the lengthy holiday break.

171.   In addition, bad weather caused numerous cancellations of school during this period.  During the time in which D.T. was attending Vena Stuart Elementary under his IEP, he received services only 15 of those days due to the holiday break and school cancellations.

172.   When D.T. returned to the recommended 1:1 ABA/Speech Language program, he began to recoup the skills lost while at Vena Stuart Elementary and began to make appropriately ambitious progress.

173.   SCS renewed its threats of truancy charges against Plaintiffs.

174.   In response, D.T.'s mother began sending weekly requests for excused absences to the principal of Vena Stuart Elementary.  Some requests were denied, but most requests went unanswered.

175.   The continuous threats of truancy charges by Webster caused a tremendous emotional burden on Plaintiffs, adding additional distress to a family already in panic-mode over their son's profound regression while at Vena Stuart Elementary.

176.   On February 19, 2018, D.T.'s mother contacted Norma Dam ("Dam"), Director of Pupil Services for SCS, requesting a Homebound Services referral on different grounds, specifically D.T.'s regression and presentation of aggressive behaviors while at Vena Stuart Elementary School.

177.   On February 21, 2018, Dam denied the request via email without inquiry as to the new factors stated in violation of the requirement to have an IEP meeting within 10 days of such request.

178.   On March 2, 2018, D.T.'s mother emailed Director of Schools Del Phillips ("Phillips") and copied the Sumner County School Board, alerting them via a Gebser letter of continuous, distressing truancy threats that Plaintiffs had been receiving from Webster.  Phillips rejected Plaintiffs' pleas and would not consider the extenuating circumstances or SCS's failure to provide D.T. with a FAPE.

179.   On March 9, 2018, Webster, as the designated representative of SCS, filed a Truancy Petition against Plaintiffs in Sumner County Juvenile Court with Docket No. 18-000815.[9]  The truancy case went to trial in December 2018 and Plaintiffs were convicted.  The conviction has never been withdrawn, expunged or overturned and remains on Plaintiffs' record.[10]

---

[9] Of note, the Petition is sworn and dated March 9, 2018, but the Affidavit attached is sworn and dated March 12, 2018.

[10] Shortly after the Truancy Petition was filed, Plaintiffs filed a Complaint in this Court to challenge SCS' right to pursue the truancy case against a family that has exercised their rights of unilateral private placement pursuant to IDEA based on the federal preemption doctrine.  That case is currently pending and captioned *D.T., et al. v. Sumner County Board of Educ.*, U.S.D.C. M.D.Tenn. Civil No. 3:18-cv-00388 (WLC/AN).

Case 3:20-cv-00732     Document 1     Filed 08/27/20     Page 46 of 153 PageID #: 46

180. Subsequently in September 2019, Plaintiffs enrolled D.T. at The Farm School, a Category IV school under Tennessee law, to prevent SCS from filing additional truancy charges against Plaintiffs.

## **PROCEDURAL HISTORY**

181. Plaintiffs sent a documents / records request pursuant to IDEA and FERPA to SCS on April 19, 2018.

182. On April 24, 2018, Plaintiffs filed their special education due process complaint against SCS ("DP Case"). The case was assigned to ALJ Cambron prior to the expiration of the 30 Day Resolution Period.

183. 30 days from April 24, 2018 was Thursday, May 24, 2018.

184. On April 26, 2018, ALJ Cambron entered a Pre-Hearing Order in the DP Case before the expiration of the 30 Day Resolution Period. The Pre-Hearing Order set a Pre-Hearing Conference for May 15, 2018, a hearing date of June 21, 2018, and stated a "FINAL ORDER will be issued by the Administrative Judge hearing this case on or before July 9, 2018." The Pre-Hearing Order states in pertinent part:

> The contested case hearing in this matter will be conducted pursuant to the IDEA, 20 U.S.C. § 1400, *et seq.*; the applicable federal regulations, 34 C.F.R. Part 300; Tennessee special education laws, TENN. CODE ANN. § 49-10-101, *et seq.*; the Rules of the State Board of Education pertaining to Special Education Programs and Services, TENN. COMP. R. & REGS. 0520-1-9 (March 2014 (Revised)); the Tennessee Uniform Administrative Procedures Act, TENN. CODE ANN. § 4-5-101, *et seq.*; and the Uniform Rules of

> Procedure for Hearing Contested Cases before State Administrative Agencies, TENN. COMP. R. & REGS. 1360-4-1 (June 2004 (Revised)). . . . Unless indicated otherwise by statute, rule, or order, the <u>Tennessee Rules of Civil Procedure and Tennessee Rules of Evidence</u> shall be applied in this contested case.

(Emphasis added.) The Pre-Hearing Order also contemplates discovery "whether formal or informal" pursuant to the TN URP to be "completed no later than fifteen (15) days prior to the hearing date" and subpoenae.

185. On May 2, 2018, SCS, then represented by Melinda Jacobs, filed its answer to the due process complaint. Shortly thereafter, the parties filed a joint request for mediation.

186. On May 12, 2018, Melinda Jacobs passed away and was replaced by Deanna Arivett as counsel for SCS.

187. ALJ Cambron granted an adjournment of the June 21, 2018 hearing date so mediation could take place, indicating that new "pre-hearing deadlines and a continued hearing date will be set, if necessary" and incorrectly stating that "The parties agreed to waive the 45-day hearing deadline for the purposes of conducting mediation, discovery and the hearing, the filing of the transcript and post-hearing briefs, as well as the issuance of the Final Order." (Emphasis added.) Plaintiffs objected that they did not "waive" the 45-day hearing deadline, but rather agreed to a brief adjournment.

188.    On May 18, 2018, Plaintiffs requested that SCS withdraw the truancy

petition against them because it was filed as retaliation for Plaintiffs' assertion of

their special education legal rights and unilateral placement of D.T.  SCS refused

this request.  As a result of SCS' refusal to withdraw the truancy petition and

subsequent conviction, Plaintiffs enrolled D.T. at Benton Hall Academy in

December 2018.

189.    On June 26, 2018, the parties had mediation for the DP Case, but were

unable to resolve the dispute.  This is the date that terminates the 30 Day

Resolution Period and triggers the 45 Day timeline.

190.    Another pre-hearing conference was held by ALJ Cambron on July

13, 2018 (16 days into the 45 Day timeline) , during which she reset the deadlines

in the DP Case.  ALJ issued an amended Pre-Hearing Order on July 19, 2018.  ALJ

Cambron set the hearing of the DP Case to begin on October 29, 2018, which is

**124 days after termination of the 30 Day Resolution Period**.  This hearing date

was set by ALJ Cambron, not due to a request for adjournment by the parties.  In

addition, ALJ Cambron required the parties to file by August 8, 2018 an "Agreed

Scheduling Order" to include discovery and expert disclosure deadlines, pre-

hearing motions, and the Five-Day Exchange, over Plaintiffs' objections.  The

amended Pre-Hearing Order included the same waiver of the 45 Day Deadline

language, to which Plaintiffs objected, from the prior Order and had the following deadlines:

- Transcript of the hearing due November 15, 2018, **141 days after termination of the 30 Day Resolution Period**;

- Plaintiffs' post-hearing brief due November 29, 2018, **155 days after termination of the 30 Day Resolution Period**;

- SCS' post-hearing brief due December 13, 2018, **169 days after termination of the 30 Day Resolution Period**; and

- "the FINAL ORDER will be issued by Administrative Judge Cambron no later than January 14, 2018 [sic; 2019]," **201 days after termination of the 30 Day Resolution Period**.

191.   Despite Plaintiffs notifying ALJ Cambron of the scheduling conflict with the hearing dates of October 29 – November 1, 2018 due to trials in other cases and objections that it violated the 45 Day Rule, these dates were placed into the amended Pre-Hearing Order.  Plaintiffs filed a motion for a very brief adjournment requesting that the hearing begin any date after November 1, 2018. SCS did not oppose the motion to adjourn.

192.   Defendant SCS proposed a scheduling order which included (a) first written discovery (interrogatories, requests for admission, requests for production); (b) more written discovery; (c) expert disclosures; (d) fact witness depositions; (e)

expert witness depositions; (f) pre-hearing briefs and motions; (g) the Five-Day Exchange; (h) four days of hearing; (i) transcript filing two weeks following the hearing; (j) post-hearing briefs; and (k) a final order issued on January 14, 2019. Plaintiffs objected to this proposed order on numerous bases, including that formal discovery is not contemplated in special education due process cases and that the Tennessee Rules of Civil Procedure do not apply; that depositions are not in accordance with IDEA; and that the proposed schedule violates IDEA.

193.    Shortly thereafter, with no discovery pending SCS filed a Motion to Compel Plaintiffs to conduct discovery pursuant to the Tennessee Rules of Civil Procedure ("TRCP"), arguing that the TN URP provides that the TRCP govern discovery in special education due process cases.  Plaintiffs objected on the basis that the TRCP on discovery do not apply to special education due process cases and that all discovery be conducted informally and that depositions are beyond the scope and costs in these cases.

194.    On August 14, 2018, ALJ Cambron held a telephone conference with counsel for the parties to address the pending motions.  ALJ Cambron granted the adjournment, but moved the hearing date to begin on December 11, 2018 depending on her availability, **167 days from the end of the 30 Day Resolution Period**.  Otherwise, the hearing would begin in January 14 or 22, 2019, **at least 201 days from the end of the 30 Day Resolution Period**.  In addition, ALJ

Cambron ruled that she would allow formal discovery, including fact and expert depositions, over objections of Plaintiffs.

195. Following ALJ Cambron's August 14, 2018 rulings, discovery requests were exchanged by the parties. SCS issued numerous subpoenae for documents and depositions and requested an observation of D.T. Plaintiffs objected to the observation of D.T. because his disability was not at issue in the litigation. Nevertheless, SCS filed a motion to compel the observation, which Plaintiffs opposed. Plaintiffs also filed motions to quash the subpoenae served by SCS.

196. SCS also filed a motion to dismiss certain discrimination claims filed by Plaintiffs. Plaintiffs opposed the motion and sought to amend their due process complaint to substitute the proper Tennessee code provisions.

197. On September 19, 2018, ALJ Cambron issued an Order: (a) granting SCS' motion to dismiss certain claims; (b) denying Plaintiffs' motion to amend their due process complaint; (c) granting SCS' motion to compel observation of D.T.; (d) denying Plaintiffs' motions to quash subpoenae; and (e) ruling that the records to be turned over by D.T.'s physicians were not subject to HIPAA regulations.

198.   Extensive written discovery continued in the DP Case, including SCS serving additional subpoenae and deposition notices.  SCS proceeded to take a number of depositions of fact witnesses.

199.   SCS filed a second motion to compel discovery and to tax costs against Plaintiffs in the DP Case.  Plaintiffs opposed this motion as exceeding the scope of discovery and the rules in special education due process cases.

200.   On November 21, 2018, **147 days beyond the termination of the 30 Day Resolution Period**, ALJ Cambron issued an Order granting SCS' second motion to compel discovery, but denying taxation of costs against Plaintiffs.  ALJ Cambron wrote, "**The parties are strongly encouraged to work cooperatively in exchanging discovery**.  Efforts by either side to resist reasonable discovery requests may well result in the taxing of costs in favor of the requesting party in the future." (Emphasis in original.)  The Order also required the parties to brief whether the APD had jurisdiction to hear the §504 and ADA claims asserted by Plaintiffs.

201.   On November 28, 2018, Plaintiffs filed a Motion for Reconsideration of ALJ Cambron's November 21, 2018 Order, arguing that "To date in this litigation, SCS has propounded 48 Interrogatories (counting subparts), 20 Requests for Documents (counting subparts), 31 Requests for Admissions, issued 5 subpoenae duces tecum (to Plaintiffs' knowledge), and taken at least 5 depositions

with plans to take several more" and "This Order now sanctions virtually unlimited discovery and infects this matter with numerous reversible errors and should be reconsidered. Additionally, such an unrestricted approach to discovery sets a bad precedent for special education due process matters in the State of Tennessee and is in conflict with federal law and other states handling of discovery in these cases." SCS opposed the motion and filed another motion to tax costs on Plaintiffs.

202. Plaintiffs timely filed their brief on §504 and ADA claims, while SCS file a motion for extension of time to file its, which was granted by ALJ Cambron.

203. On December 20, 2018, **176 days beyond the termination of the 30 Day Resolution Period**, ALJ Cambron issued an Order denying the motion to reconsider the discovery order and allowing argument on SCS' motion to tax costs.

204. SCS continued to take additional discovery, including subpoenae and depositions, which extended into January 2019. SCS also requested another observation of D.T. and a further adjournment of the due process hearing. Plaintiffs complied with these discovery requests as well as ALJ Cambron's rulings on discovery, but objected to the additional observation of D.T. and further adjournment of the DP Case.

205. SCS filed another motion to compel observation of D.T., which Plaintiffs opposed.

206. Plaintiffs filed a Motion for Partial Summary Judgment in the DP Case on the issue that D.T.'s private placement at HOPE Autism was appropriate given his circumstances and needs as a child with a disability.

207. On January 22, 2019, **209 days beyond the termination of the 30 Day Resolution Period**, SCS next filed a Motion for Continuance of the hearing on the basis that Plaintiffs would seek reimbursement for D.T.'s private placement at Benton Hall Academy, which Plaintiffs did to avoid further truancy charges. Plaintiffs opposed the motion for continuance because the proposed extensive discovery of Benton Hall Academy was abusive and represented that Plaintiffs would not seek reimbursement for the private placement at Benton Hall Academy tuition at that time and cross-moved for taxation of costs against SCS.

208. On January 24, 2019, ALJ Cambron issued Orders (a) setting a hearing date on the motion to tax costs against Plaintiffs from prior motions; (b) denying SCS' motion to compel further observation of D.T. and to take discovery of Benton Hall Academy; (c) denying SCS' motion for continuance of the hearing; and (d) denying Plaintiffs' motion to tax costs against SCS.

209. Thereafter, SCS continued extensive discovery and Plaintiffs complied with responding to same so as to avoid further motions to compel and to tax costs by SCS.

210.   ALJ Cambron had by motion of SCS adjourned the hearing to March 4, 2019, so as to accommodate all of SCS' discovery permitted by ALJ Cambron's prior orders.

211.   On February 11, 2019, SCS moved to exclude Plaintiffs' sole expert Dr. McCarton on the basis that she had destroyed her notes / working file on D.T.

212.   Without notice or explanation, on February 12, 2019, ALJ Cambron emailed the parties' counsel stating that the DP Case was reassigned to ALJ Stovall.  This reassignment occurred 20 days prior to the continued hearing date set by ALJ Cambron and left several motions pending without rulings.

213.   Plaintiffs conducted substantial research on the background of ALJ Stovall and, based on that research and his apparent conflict of interest, sent a letter on February 13, 2019 requesting that he recuse himself from the DP Case.  Via a conference call, ALJ Stovall requested that Plaintiffs put their request into a formal Motion for Disqualification.  Plaintiffs did so and filed the motion on February 14, 2019.  SCS opposed this motion the next day.

214.   Plaintiffs thereafter filed their opposition to SCS' motion to exclude expert Dr. McCarton.

215.   During a conference call on February 20, 2019, ALJ Stovall stated that he would not recuse / disqualify himself from the DP Case.

216.  On February 21, 2019, Plaintiffs provided notice to ALJ Stovall and SCS that they intended to pursue an accelerated interlocutory appeal of the denial of the motion for disqualification and also moved to stay the DP Case pending the outcome of that appeal.

217.  On March 1, 2019, ALJ Stovall issued a formal Order denying Plaintiffs' Motion for Disqualification, but granting the uncontested motion to stay and continue the hearing until resolution of the appeal of that motion.

218.  On March 11, 2019, Plaintiffs filed an action in this Court seeking appellate review of ALJ Stovall's denial of the Motion for Disqualification.  The matter was dismissed by this Court for lack of jurisdiction on December 3, 2019.

219.  On December 5, 2019, Plaintiffs filed a Motion for Declaratory Ruling on the motions that were pending in the DP Case at the time when ALJ Cambron reassigned the case to ALJ Stovall.  SCS opposed this motion and file a cross-motion to compel further discovery in the DP Case.  Plaintiffs opposed SCS' cross-motion for discovery.

220.  On January 9, 2020, ALJ Stovall issued an Order: (a) denying SCS' Motion to Exclude Plaintiffs' Expert Dr. McCarton; (b) denying Plaintiffs' Motion for Partial Summary Judgment on the appropriateness of D.T.'s private placement at HOPE Autism; and (c) granting in part, denying in part SCS' Motion to Compel Supplemental Discovery.

221.   SCS pursued supplemental discovery and Plaintiffs complied therewith.  During this supplemental discovery, Plaintiffs learned that one of SCS' witnesses altered a document and thereby changed her deposition testimony. Plaintiffs moved to exclude this evidence and sought sanctions against SCS.  SCS opposed the motion.

222.   SCS then pursued still more discovery.  Plaintiffs filed a Motion for a Protective Order to prevent more delaying discovery and for sanctions against SCS.  SCS opposed this motion, arguing it was entitled to more discovery.

223.   On January 24, 2020, ALJ Stovall issued an Order denying Plaintiffs Motion to Exclude Evidence and for Sanctions, but granted in part, denying in part Plaintiffs' Motion for Protective Order on additional discovery.  The Order required Plaintiffs' fact witnesses to have available underlying data that supports their reports at the hearing, even though such materials were already produced to SCS, and required Dr. McCarton to appear for a second deposition prior to the hearing.  Plaintiffs complied with the additional discovery.

224.    The DP Case hearing was conducted over eight (8) days – February 4, 5, 6, 7, 10, 11, and March 3 and 4, 2020.

225.   By Order of ALJ Stovall, Plaintiffs' closing brief was due on May 1, 2020; SCS' closing brief was due on May 8, 2020; and ALJ Stovall indicated he would issue his final decision no later than June 30, 2020.

226. On June 29, 2020, ALJ Stovall issued his Final Order in the DP Case finding in favor of SCS and against Plaintiffs.

227. Accounting for the joint agreed adjournments[11] of the DP Case and the period during which Plaintiffs sought the interlocutory appeal of the denial of the Motion for Disqualification, ALJ Stovall's Final Order was issued **400 days after termination of the 30 Day Resolution Period**. The calculation of this number is as follows:

| Event Date | # Days | Subtotal |
|---|---|---|
| June 29, 2020 Final Order | 733 | 733 |
| Interlocutory Appeal 3/1/19 - 12/3/19 | -277 | 456 |
| Agreed adjournment #2 1/11/19 – 3/4/19 (¶210) | -52 | 404 |
| Agreed adjournment #1 (¶191) | -4 | **400** |

228. On July 20, 2020, Plaintiffs filed their Notice of Appeal with the APD of ALJ Stovall's Final Order.

## <u>COUNT ONE – SYSTEMIC VIOLATION OF THE 45 DAY RULE</u>
### (All Defendants)

229. Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

---

[11] These are adjournments requested by the parties by consent and not by an ALJ or to accommodate the ALJ's schedule.

230.   IDEA special education due process cases were not designed to be full civil litigations with discovery and motion practice.  They were designed by Congress to be a swift fact-finding and decision proceeding so that a child with a disability's education could get back on course quickly.  This is why the IDEA regulation specifically requires a decision within 45 days.  (*See supra* ¶64.)

231.   The DP Case took **400 days** to get to a final decision, accounting for all adjournments requested by the parties.  (*See supra* ¶227.)  This shocks the conscience.

232.   ALJ Cambron's initial Pre-Hearing Order was compliant with the 45 Day Rule.  (*See supra* ¶184.)   However, ALJ Cambron's amended Pre-Hearing Order and all subsequent scheduling orders violated the 45 Day Rule.  (*See supra* ¶¶190, 194.)  In addition, ALJ Cambron violated the 45 Day Rule by granting SCS free reign to conduct any and all discovery it wanted.  (*See supra* ¶¶197, 200, 210.)  ALJ Cambron also violated the 45 Day Rule by reassigning the case to ALJ Stovall at the last minute before the scheduled hearing date without cause or explanation, causing an unnecessary and unrequested delay.  (*See supra* ¶212.)

233.   ALJ Cambron erred when she stated twice that Plaintiffs "waived" the 45 Day Rule.  Plaintiffs never "waived" the 45 Day Rule, but only requested and/or agreed to brief adjournments.  The long delays were a result of ALJ

Cambron's schedule and her permission to SCS to conduct lengthy discovery in violation of IDEA, its regulations, and TN SER.

234. ALJ Stovall violated the 45 Day Rule by allowing SCS additional discovery and further delaying the hearing. (*See supra* ¶¶220, 223.) ALJ Stovall also violated the 45 Day Rule by permitting 8 days of hearings, 15 days for production of the transcripts, post-hearing briefing, and allowing himself an additional 53 days after post-hearing briefing to issue a final order. (*See supra* ¶¶224-225.) ALJ Stovall violated the 45 Day Rule by issuing the Final Order on June 29, 2020, **117 days after the last day of the hearing**. (*See supra* ¶¶224, 226.)

235. SCS violated the 45 Day Rule by proposing a scheduling order that far exceeded the 45 day timeline (*see supra* ¶192); by seeking massive amounts of written discovery and depositions (*see supra* ¶¶195, 198, 204, 209, 221, 222); by filing multiple motions to compel discovery (*see supra* ¶¶193, 199, 205); by filing a motion to continue the hearing **209 days beyond the termination of the 30 Day Resolution Period** (*see supra* ¶207); and filing a specious motion to exclude Plaintiffs' expert in the DP Case (*see supra* ¶211).

236. SCS violated the 45 Day Rule by filing an unnecessary motion to dismiss **55 days after termination of the 30 Day Resolution Period**. (*See supra* ¶196.) The only motion contesting a due process complaint in IDEA is a

sufficiency challenge which must be filed within 10 days of the due process complaint. 20 U.S.C. §1415(c)(2)(B).

237. The egregious violation of the 45 Day Rule in the DP Case was a direct and proximate result of the actions of ALJ Cambron, ALJ Stovall, and SCS as detailed above.

238. Based on the statistics of the USOSEP, this is a systemic violation of the 45 Day Rule by TNDOE and APD whereby less than 17% of cases have been decided within the 45 day timeline in the last 7 years. (*See supra* ¶113.)

239. Upon information and belief, TNDOE, as SEA, receives federal funding and therefore owes D.T. a FAPE.

240. As described at length above, TNDOE has failed to comply with the procedural requirements of the IDEA.

241. TNDOE has failed to ensure that procedural requirements guaranteeing parents the opportunity to present a due process complaint and have prompt resolution of the dispute within the statutory time frame are available.

242. TNDOE's systemic design flaw by using the APD as the adjudicative body to resolve special education disputes has resulted in a denial of FAPE to children with disabilities and their families in the State of Tennessee.

243. By selecting APD as the body to handle special education disputes in the State of Tennessee and knowing that the APD had a limited number of ALJs

adequately trained in special education law, TNDOE knew or should have known that its system for resolving special education disputes was flawed *ab initio*.

244. By selecting APD as the body to handle special education disputes in the State of Tennessee and knowing that the APD had full dockets handling other matters, TNDOE knew or should have known that the APD could not comply with the 45 Day Rule.

245. TNDOEs violations are exacerbated by the 'Stay Put' Rule. The delay in resolving these cases causes Plaintiffs to remain with a 'stay put' IEP for an excessive period, almost always beyond the intended expiration period of that IEP and with services and special education that is no longer appropriately designed for the child.

246. This harm is aggravated further if Plaintiffs need appeal the decision in a due process case to a court of law, which already has built in delays due to the jurisdiction of judicial branch courts.

247. By statute, a school year for public schools in the State of Tennessee is 180 days. T.C.A. §49-6-3004.

248. Special education cases that exceed 180 days, i.e. a full school year, are *per se* violations of IDEA and also *per se* harmful to students with disabilities in the State of Tennessee. *See C.P., et al. v. New Jersey Department of Education, et al.*, Civil No. 19-cv-12807, U.S. District Judge Noel L. Hillman, op. at 28

(D.N.J. May 22, 2020) ("a significant delay in providing a due process hearing – one measured in months beyond expiration of the 45 Day Rule – constitutes a substantive as opposed to procedural harm, and therefore, constitutes a denial of a FAPE"); *D.T. v. Monroe Twp. Bd. of Educ.*, No. 18-9580, 2019 WL 1760583, at *1 (D.N.J. Apr. 22, 2019); *Blackman v. D.C.*, 382 F. Supp. 2d 3, 9 (D.D.C. 2005).

249.   The DP Case stands as an example of this violation in that Plaintiffs APD Case took <u>four hundred (400) days from the end of the resolution period</u> to resolve.  That is greater than two times (2x) the statutory number of days in a full school year.

250.   When Plaintiffs' special education dispute was filed, D.T. was 7 years old.  When ALJ Stovall's Final Order was issued, D.T. was less than a month from celebrating his 10th birthday.

251.   As a result, TNDOE has failed to establish a system guaranteeing a FAPE to children with disabilities in the State of Tennessee and has thereby violated the basic tenets of IDEA and other special education and anti-discrimination laws.

252.   Based on the foregoing, the statutory legal rights of children with disabilities and their families in the State of Tennessee were violated under the IDEA, the federal regulations promulgated thereunder, and other special education laws.

253. Defendants' actions have caused Plaintiffs damages. Specifically, D.T. has been denied a FAPE for every day that the DP Case exceeded the 45 Day Rule. Plaintiffs are entitled to all appropriate relief as a result of this harm.

254. TNDOE must immediately rectify its flawed system and provide relief for the harm caused by the delay in their special education cases.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A. Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B. Declaring that SCS did not negotiate in good faith during the 30 Day Resolution Period because it knew that the APD and ALJ Cambron would permit violations of the 45 Day Rule and extend the case out with substantial delays;

C. Declaring that Defendants violated the 45 Day Rule as a matter of law;

D. Declaring that, as a result of the numerous violations of the 45 Day Rule, Defendants denied Plaintiffs a FAPE;

E. Declaring that Plaintiffs are the prevailing parties in the DP Case;

F.    Declaring that TNDOE and the APD are systemically violating the 45 Day Rule in express contradiction to IDEA's regulations and the TN SER;

G.    Injunctive relief requiring TNDOE and APD to comply with the 45 Day Rule and appointing a federal monitor to ensure compliance;

H.    Compensatory relief to Plaintiffs for all Defendants' violations of the 45 Day Rule;

I.    Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

J.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

K.    For such other and further relief as the Court deems equitable and just.

## COUNT TWO – SYSTEMIC VIOLATION OF THE ADJOURNMENT RULE
### (All Defendants)

255.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

256.    Neither the TNDOE, the APD, nor any ALJ may adjourn a due process hearing absent a request by a party.  (*See supra* ¶¶66-67.)

257.   ALJs Cambron and Stovall violated the Adjournment Rule numerous times in the DP Case by adjourning the case on their actions when there was no request by a party to do so.  (*See supra* ¶¶187, 190, 194, 210.)  In addition, the reassignment of the case from ALJ Cambron to ALJ Stovall was a further violation of the Adjournment Rule because it caused an unexpected and unnecessary adjournment of the DP Case not requested by the parties.  (*See supra* ¶212.)

258.   SCS violated the Adjournment Rule by requesting and/or obtaining adjournments without good cause in the DP Case.  (*See supra* ¶¶204, 207.)  By pursuing illegal discovery and motion practice in the DP Case, *e.g.* formal written discovery, depositions, motions to compel, and untimely motions to dismiss, SCS intentionally took unfair advantage of the wrongful TNDOE-designed and APD-implemented system for resolving special education disputes.

259.   Upon information and belief, the APD regularly grants adjournments to accommodate the schedules of the APD and/or ALJs without requests from the parties to special education due process cases.

260.   TNDOE, by allowing the APD to regularly violate the Adjournment Rule and LEAs to take unfair advantage in this flawed system, has failed in its legal duty to enforce IDEA, the federal regulations, and the Tennessee Administrative Code.

261.   As a direct and proximate result of these violations, Plaintiffs suffered harm by SCS not negotiating in good faith during the 30 Day Resolution Period knowing that the APD and ALJs Cambron and Stovall would readily adjourn the DP Case without good cause, despite Plaintiffs making a very reasonable settlement demand during mediation which should have resolved the DP Case before proceeding to hearing and thereby causing Plaintiffs to incur substantial additional attorney's fees and costs.

262.   As a direct and proximate result of these violations, Plaintiffs suffered harm by the multiple adjournments which caused the case to take nearly two years to resolve and delaying appeal of the case and allowing SCS to litigate the case like a massive civil litigation, completely contrary to the language and spirit of IDEA on special education disputes and thereby causing Plaintiffs to incur substantial additional attorney's fees and costs.

263.   As a direct and proximate result of these violations, Plaintiffs suffered harm by having the DP Case being adjourned multiple times without a request to do so and thereby allowing SCS to present evidence in the DP Case when it was otherwise not prepared to do so.

264.   Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in favor of SCS when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.  Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.  Declaring that ALJ Cambron and ALJ Stovall violated the Adjournment Rule on multiple occasions and without good cause;

C.  Declaring that SCS would not have been able to present nearly five (5) days of evidence in the DP Case but for the violations of the Adjournment Rule;

D.  Declaring that TNDOE and the APD are systemically violating the Adjournment Rule in Tennessee special education due process cases in express contradiction to IDEA, its regulations, and the TN SER;

E.  Declaring that SCS did not negotiate in good faith during the 30 Day Resolution Period because it knew that the APD and ALJs Cambron and Stovall would permit illegal adjournments to the DP Case and extend the case out with substantial, improper delays;

F.  Declaring that Defendants violated the Adjournment Rule as a matter of law;

G.  Declaring that, as a result of the numerous violations of the Adjournment Rule, Defendants denied Plaintiffs the guarantee of the

Procedural Safeguards under IDEA and thereby denied Plaintiffs due process of law;

H.    Declaring that Plaintiffs are the prevailing parties in the DP Case;

I.    Injunctive relief requiring TNDOE and APD to comply with the Adjournment Rule and appointing a federal monitor to ensure compliance;

J.    Compensatory relief to Plaintiffs for all Defendants' violations of the Adjournment Rule;

K.    Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

L.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

M.    For such other and further relief as the Court deems equitable and just.

## COUNT THREE – SYSTEMIC VIOLATION OF THE ACCESS TO RECORDS PROCEDURAL SAFEGUARD
### (All Defendants)

265.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

266.   Parents have an absolute and unfettered right to access the school records of their child with a disability.  20 U.S.C. §1415(b)(1); *see also* 20 U.S.C. §§1232g and 1232h (Family Education Rights and Privacy Act aka FERPA).

267.   IDEA's Procedural Safeguard of parents' right to access their child's educational records is separate and distinct from the Procedural Safeguard of the right to file a due process case.  *Compare* 20 U.S.C. §§1415(b)(1) and 1415(b)(6). The right to access a child with a disability's education records is fundamental and not "discovery".

268.   Under IDEA and FERPA, a parents' right to access their child's school records does not have a prerequisite of the child being currently registered or enrolled at the LEA.

269.   In addition, IDEA and Tennessee law permits a parent to review testing instruments and protocols when a child with a disability is evaluated.  (*See* OSEP Guidance Letter to Price, U.S. Dept. of Ed., Oct. 13, 2010; *Newport-Mesa v. California Dept of Ed*, 371 F.Supp.2d 1170 (2005), holding statute requiring copies of test protocols to be provided to parents of special education students falls within acceptable "fair use" under federal copyright law; and *supra* ¶47, T.C.A. §49-2-211.)

270.   In the summer of 2017, Plaintiffs requested access to D.T.'s school records kept at SCS.

271.   SCS responded to Plaintiffs' 2017 records request that Plaintiffs would not be provided access until D.T. was registered as a student in SCS.

272.   Plaintiffs again requested D.T.'s school records from SCS in April 2018, prior to filing the due process complaint in the DP Case.  (*See supra* ¶181.)

273.   SCS delayed providing those documents claiming they were discovery requests.

274.   Plaintiffs also requested access to the testing instruments and protocols being used by SCS to evaluate D.T.  This request was denied by SCS without any explanation or reference to law or policy.  (*See supra* ¶133.)

275.   SCS violated Plaintiffs' right to access D.T.'s records in a timely manner and prior to a due process hearing as guaranteed by IDEA and therefore violated the referenced Procedural Safeguard.  *See* 34 C.F.R. §300.613(a).

276.   ALJ Stovall violated the Procedural Safeguard by not enforcing Plaintiffs' right to access D.T.'s records in sufficient time prior to a due process hearing against SCS.

277.   Upon information and belief, TNDOE and the APD routinely fail to enforce the Procedural Safeguard of parents' right to access their child with a disability's education records "without unnecessary delay" and/or prior to an IEP meeting or due process hearing and thereby systemically violate the Procedural Safeguard.

278.   As a direct and proximate result of these violations, Plaintiffs suffered harm by SCS delaying in providing Plaintiffs access to D.T.'s records and thereby preventing Plaintiffs from adequately preparing for the DP Case.  Plaintiffs had to obtain these documents through the more expensive and time-consuming method of discovery, over Plaintiffs' objections to ALJ Cambron.

279.   As a direct and proximate result of these violations, Plaintiffs suffered harm by SCS claiming Plaintiffs' access to D.T.'s records was a "discovery request" and thereby being able to escape enforcement by ALJs Cambron and Stovall under their scheduling orders.

280.   As a direct and proximate result of these violations, Plaintiffs suffered harm by SCS being permitted to delay providing access to D.T.'s records and prepare their case, when SCS clearly was not prepared to go to hearing on a timely basis.

281.   As a direct and proximate result of these violations, Plaintiffs suffered harm by SCS being permitted to delay providing access to D.T.'s records which did not provide sufficient time to determine if SCS's responses to discovery sufficiently provided proper "access" to records, fulfilled the request for access completely, and whether Plaintiffs needed supplemental access to fulfill the request.

282.   As a direct and proximate result of these violations, Plaintiffs have been harmed because procedural violation impeded the D.T.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to D.T., and caused a deprivation of educational benefits to D.T.

283.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs.

284.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.     Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.     Declaring that ALJ Cambron and ALJ Stovall violated Plaintiffs' rights under IDEA's Access to Records Procedural Safeguard;

C.     Declaring that SCS violated Plaintiffs' rights under IDEA's Access to Records Procedural Safeguard;

D.  Declaring that SCS should have been barred from presenting evidence in the DP Case regarding assessments of D.T. due to its violation of IDEA's Access to Records Procedural Safeguard;

E.  Declaring that TNDOE and the APD are systemically violating parents' rights under IDEA's Access to Records Procedural Safeguard in Tennessee special education due process cases in express contradiction to IDEA and its regulations;

F.  Declaring that Defendants violated Plaintiffs' rights under IDEA's Access to Records Procedural Safeguard;

G.  Declaring that, as a result of the numerous violations of IDEA's Access to Records Procedural Safeguard, Defendants denied Plaintiffs the guarantee of the Procedural Safeguards under IDEA and thereby denied Plaintiffs due process of law;

H.  Declaring that Plaintiffs are the prevailing parties in the DP Case;

I.  Injunctive relief requiring TNDOE and APD to comply with IDEA's Access to Records Procedural Safeguard and appointing a federal monitor to ensure compliance;

J.  Compensatory relief to Plaintiffs for all Defendants' violations of IDEA's Access to Records Procedural Safeguard;

K.    Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

L.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

M.    For such other and further relief as the Court deems equitable and just.

## COUNT FOUR – DECLARATORY JUDGMENT ON NON-APPLICABILITY OF THE TN URP AND TRCP TO IDEA CASES
### (All Defendants)

285.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

286.    IDEA special education disputes were not designed by Congress to be large-scale civil actions. They were designed to address concerns by parents as to the education being provided by LEAs to their children with disabilities. IDEA and its regulations were promulgated to enable *pro se* parents to get a fair hearing without having to hire expensive legal counsel or possess extensive knowledge of legal procedure, neither of which most parents can afford. Simply because Plaintiffs herein could afford legal counsel does not mean they are not entitled to those same protections.

287.    The Federal Declaratory Judgment Act provides that "In a case of actual controversy within its jurisdiction, [exceptions omitted as inapplicable], any

court of the United States, upon the filing of an appropriate pleading, may declare

the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought. Any such declaration shall have

the force and effect of a final judgment or decree and shall be reviewable as such."

28 U.S.C. §2201(a).

288.   There is an actual and justiciable controversy between Plaintiffs and

Defendants as to the interpretation and/or application of certain provisions of the

Tennessee Administrative Code in special education due process hearings.

Plaintiffs allege they have been harmed by both a wrongful interpretation and

application of incorrect provisions of the TN URP and Tennessee Rules of Civil

Procedure ("TRCP") in the DP Case.

289.   The Supremacy Clause of the U.S. Constitution states that federal law

"shall be the supreme law of the land; and the judges in every state shall be bound

thereby, anything in the Constitution or laws of any State to the contrary

notwithstanding."  U.S. Constitution, Article VI, Clause 2.

290.   The U.S. Supreme Court has held that if there is a conflict between a

federal law and state law, the federal law prevails. *See Cipollone v. Liggett Group,*

*Inc.*, 505 US 504, 516 (1992) ("Thus, since our decision in *McCulloch v.*

*Maryland*, 4 Wheat. 316, 427 (1819), it has been settled that state law that conflicts

with federal law is "without effect." *Maryland v. Louisiana*, 451 U. S. 725, 746 (1981).")

291.   Under the doctrine of federal preemption, which is rooted in the Supremacy Clause of the Constitution of the United States, state laws are invalid if they "'interfere with, or are contrary to, federal law. There are three types of preemption: express preemption and two types of implied preemption, field preemption and conflict preemption. Conflict preemption is found where 'compliance with both federal and state regulations is a physical impossibility,' or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *R.B. v. Mastery Charter School*, 532 Fed. Appx. 136, Opinion at 12 (3rd Cir. 2013) [internal citations omitted].

292.   There is a direct conflict between the scheme under federal IDEA law for resolving special education disputes and TNDOE's system under the Tennessee Administrative Code for how Tennessee handles special education disputes as detailed in part in previous allegations of this Complaint.

293.   SEAs and LEAs must strictly comply with and enforce IDEA law. (*See supra* ¶¶55, 56, 100.)

294.   TN SER reiterates and incorporates the strict compliance and enforcement of IDEA.  (*See supra* ¶¶80, 81, 85.)

295. TNDOE and SCS must, therefore, strictly comply with and enforce IDEA law.

296. Compliance with and enforcement of IDEA includes the procedures used in special education due process cases, including without limitation the 45 Day Rule and Adjournment Rule. (*See supra* ¶¶57, 64, 66.)

297. TN SER was established to mirror IDEA's procedural rules for special education due process cases. (*See supra* ¶¶80-82, 88.)

298. All Defendants herein must, therefore, strictly comply with and enforce procedures used in special education due process cases under IDEA.

299. Defendants treat the TN URP and TRCP as the rules that govern special education due process hearings in Tennessee, but many provisions of the TN URP and TRCP conflict with IDEA, not least of which is the conflict between discovery and motion practice under TN URP and TRCP and the 45 Day Rule under IDEA.

300. "Parties are encouraged where practicable to attempt to achieve any necessary discovery informally, in order to avoid undue expense and delay in the resolution of the matter at hand." TN URP §1360-04-01-.11.

301. There are no rules on discovery beyond the Five-Day Exchange Rule in IDEA or the TN SER. (*See* 20 U.S.C. §1415(f)(2)(A); 34 C.F.R. §300.512(b)(1); *supra* ¶90.)

302.   TN URP, however, allows resort to the TRCP in complex cases. "When such attempts have failed, or where the complexity of the case is such that informal discovery is not practicable, discovery shall be sought and effectuated in accordance with the Tennessee Rules of Civil Procedure."  TN URP §1360-04-01-.11(1).

303.   The TRCP permits various methods of discovery.  (*See* TRCP 26.01.)

304.   Discovery under TRCP violates IDEA's 45 Day Rule.  A court may hold a discovery conference at any time, TRCP 26.06; notices of depositions must be served at least 5 days in advance of the deposition, TRCP 30.02; responses to interrogatories, requests for production of documents, and requests for admissions may be served 30 days after the requests, TRCP 33.01, 34.02, and 36.01; and prior to filing a motion to compel, the parties must 'meet and confer' on the discovery dispute, TRCP 26.06(1)(E); *see also* TN URP §1360-04-01-.11(3).  Application of these rules would make timely completion of the special education due process hearing and issuance of the decision by the ALJ impossible.

305.   Similarly, TRCP rules on motions and scheduling conferences would also make compliance with the 45 Day Rule impossible.  (*See* TRCP 6.04, 7.02, 12.01, 16.01.)

306. In a motion to compel and proposed scheduling order in the DP Case, SCS argued that it was entitled to take discovery under TN URP and TRCP. (*See supra* ¶¶192, 193.)

307. SCS undertook massive discovery in the DP Case in a 'scorched earth' approach to litigation, as if it was a mass tort tobacco case. (*See supra* ¶¶192, 195, 198, 199, 204, *et al*.)

308. Plaintiffs objected on the basis that TN URP and TRCP do not apply to IDEA special education due process cases, primarily because they would violate the 45 Day Rule. (*See supra* ¶193.)

309. ALJ Cambron erroneously stated in her first Pre-Hearing Order that TN URP and TRCP applied to the DP Case. (*See supra* ¶184.)

310. ALJ Cambron agreed with SCS and granted several motions to compel discovery based on the TN URP and TRCP. (*See supra* ¶¶194, 197, 200, 203.) Indeed, ALJ Cambron stated, "Efforts by either side to resist reasonable discovery requests may well result in the taxing of costs in favor of the requesting party in the future." (*See supra* ¶200.)

311. ALJ Stovall likewise applied the TN URP and TRCP to the DP Case.

312. As a direct and proximate result of the application of the TN URP and TRCP, the DP Case extended out over a nearly 2 year period in violation of the 45 Day Rule.

313. Upon information and belief, this is a common occurrence in Tennessee special education due process cases because TNDOE, the APD, the ALJs, and the LEAs, such as SCS herein, permit discovery, motion practice, scheduling conferences, and other applications of the TN URP and TRCP.

314. As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded the D.T.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to D.T., and caused a deprivation of educational benefits to D.T.

315. As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in having to comply with and respond to massive discovery requests, motion practice by SCS, and the rulings by ALJs Cambron and Stovall.

316. As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order
      as error;

B.    Declaring that application of the TN URP and TRCP in IDEA special
      education due process cases violates IDEA's Procedural Safeguards;

C.    Declaring that application of the TN URP and TRCP in IDEA special
      education due process cases violates the due process of law;

D.    Declaring that the TN URP and TRCP do not and shall not apply in
      IDEA special education due process cases;

E.    Declaring that, by application of the TN URP and TRCP in the DP
      Case, Defendants violated IDEA's Procedural Safeguards;

F.    Declaring that, by application of the TN URP and TRCP in the DP
      Case, Defendants violated Plaintiffs' due process rights and denied
      them due process of law;

G.    Declaring that, because Defendants violated Plaintiffs' rights under
      IDEA and denied them due process of law, ALJ Stovall's June 29,
      2020 Final Order is null and void;

H.    Declaring that Plaintiffs are the prevailing parties in the DP Case;

I.    Injunctive relief preventing TNDOE, the APD and all ALJs from
      applying the TN URP and TRCP to IDEA special education due
      process cases;

J.  Compensatory relief to Plaintiffs for all Defendants' violations and denial of due process of law;

K.  Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

L.  An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

M.  For such other and further relief as the Court deems equitable and just.

## COUNT FIVE – SYSTEMIC VIOLATION OF IDEA BY ALLOWING DISCOVERY IN SPECIAL EDUCATION DUE PROCESS CASES
### (All Defendants)

317.  Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

318.  As discussed at length above, aside from the Five-Day Exchange Rule IDEA does not provide for "discovery" in special education due process cases. The rapid timeline does not permit it or there would be universal violation of the 45 Day Rule. This is why there is a Procedural Safeguard for obtaining educational records for a child with a disability separate from the due process provisions.

319.  Despite that, SCS pursued extensive discovery and ALJs Cambron and Stovall permitted it in the DP Case, including without limitation numerous

depositions and expert discovery. This cost Plaintiffs a substantial amount of money.

320. Upon information and belief, TNDOE, the APD, and all ALJs systemically permit discovery in Tennessee special education due process cases, which is a per se violation of IDEA.

321. As a direct and proximate result of pursuing and allowing discovery in the DP Case in violation of IDEA, Defendants caused the DP Case to grossly and unfairly violate the 45 Day Rule.

322. As a direct and proximate result of pursuing and allowing discovery in Tennessee special education due process cases in violation of IDEA, Defendants are systemically violating IDEA and denying a FAPE to children with disabilities in the State of Tennessee that file due process complaints.

323. As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in having to comply with and respond to massive discovery by SCS and rulings by ALJs Cambron and Stovall compelling discovery in violation of IDEA.

324. As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A. Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B. Declaring that discovery and application of discovery rules in special education due process cases violate IDEA and are illegal and improper;

C. Declaring that ALJ Cambron and ALJ Stovall violated IDEA by permitting discovery and applying the Tennessee discovery rules in the DP Case;

D. Declaring that SCS intentionally and knowingly violated IDEA by pursuing discovery and filing motions to compel discovery in the DP Case because it knew that the APD and ALJs Cambron and Stovall would permit discovery;

E. Declaring that SCS should have been barred from pursuing discovery in the DP Case;

F. Declaring that TNDOE and the APD are systemically violating IDEA by permitting discovery and applying discovery rules in Tennessee special education due process cases;

G. Declaring that Defendants violated Plaintiffs' rights under IDEA;

H. Declaring that, as a result of the violations of IDEA, Defendants denied Plaintiffs the guarantee of the Procedural Safeguards under IDEA and thereby denied Plaintiffs due process of law;

I. Declaring that Plaintiffs are the prevailing parties in the DP Case;

J. Injunctive relief requiring TNDOE and APD to cease allowing discovery and applying discovery rules in special education due process cases and appointing a federal monitor to ensure compliance;

K. Compensatory relief to Plaintiffs for all Defendants' violations of IDEA;

L. Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

M. An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

N. For such other and further relief as the Court deems equitable and just.

## COUNT SIX – SYSTEMIC VIOLATION OF HEARING OFFICER QUALIFICATIONS
### (Defendants TNDOE, APD, ALJ Cambron, ALJ Stovall)

325. Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

326. As described at length above, Defendants TNDOE, the APD, ALJ Cambron, and ALJ Stovall have failed to comply with IDEA, the federal regulations, and the Tennessee Administrative Code in several respects.

327. Hearing officers that preside over special education due process cases must be independent and have no conflicts of interest. (*See supra* ¶¶70, 93, 94.)

328. Hearing officers that preside over special education due process cases must be well-trained in special education law and how to conduct and decide such cases. (*See supra* ¶¶71, 92.)

329. TNDOE's systemic design flaw by using the APD as the adjudicative body to resolve special education disputes has resulted in a denial of FAPE to children with disabilities and their families in the State of Tennessee and specifically to D.T.

330. By selecting APD as the body to handle special education disputes in the State of Tennessee and knowing that the APD had a limited number of ALJs, the ALJs are provided inadequate training in special education law and TNDOE knew or should have known that its system for resolving special education disputes was flawed *ab initio*.

331. Prior to her untimely death, Melinda Jacobs was one of the primary instructors for training ALJs in special education law in the State of Tennessee. Ms. Jacobs was also frequently school district counsel in special education due

process cases in Tennessee, including the DP Case when it was first filed. Thus, TNDOE and the ALJs at the APD were provided very biased special education law training that favored school districts. Upon information and belief, none of the training provided to the ALJs in Tennessee was conducted by attorneys that regularly represent parents of children with disabilities. Thus, there was an inherent conflict in that Ms. Jacobs appeared before the same ALJs she had trained on special education law.

332. Upon information and belief, ALJs Cambron and Stovall were trained by Melinda Jacobs on special education law. Ms. Jacobs represented SCS in the DP Case until her untimely death. SCS counsel in the remainder of the DP Case were those who mentored under Ms. Jacobs.

333. ALJs Cambron and Stovall exhibited a bias towards SCS and a failure to abide by or lack of knowledge of special education law. Upon information and belief, such failure to comply with IDEA and special education law is a result of inadequate training, biased training by Ms. Jacobs, and/or an intentional animosity towards children with disabilities and their families and their counsel.

334. Upon information and belief, most of the ALJs assigned to special education due process cases by the APD in Tennessee do not have special training in nor possess knowledge of the provisions of IDEA, its regulations, or the Tennessee regulations for special education due process cases.

335. The APD and the ALJs that handle special education due process cases operate under the erroneous belief that special education law is state law, rather than federal law, and often make rulings that conflict with the express language of IDEA, its regulations, and the TN SER because they have not been properly trained on the federal special education law.

336. The TNDOE, the entity responsible to ensure compliance with IDEA, has failed to provide proper and adequate training to the APD and the ALJs on special education law.

337. TNDOE is not properly overseeing how the APD and the ALJs handle special education due process cases and thereby violate their legal duties under IDEA.

338. Because ALJs lack training, knowledge, and jurisdiction, TNDOE's system of assigning special education disputes to the APD is flawed and broken.

339. As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of training and expertise in special education law because they have received invalid rulings to their detriment in the DP Case.

340. As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of training and expertise in special education law because SCS benefitted from invalid rulings that enabled it to win the DP Case.

341.   TNDOE's systemic violations of IDEA have caused Plaintiffs damages.  Specifically, Plaintiffs have been denied a FAPE for procedural violations in the DP Case sent to the APD, which does not meet the statutory qualifications for hearing officers.  Plaintiffs are entitled to all appropriate relief as a result of this harm.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.   Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.   Declaring that ALJ Cambron and ALJ Stovall violated IDEA by presiding over and making rulings in the DP Case without adequate and proper training in special education law;

C.   Declaring that TNDOE and the APD are systemically violating IDEA by failing to properly train the ALJs that handle special education due process cases;

D.   Declaring that these Defendants violated Plaintiffs' rights under IDEA;

E.   Declaring that, as a result of the violations of IDEA, Defendants denied Plaintiffs the guarantee of the Procedural Safeguards under IDEA and thereby denied Plaintiffs due process of law;

F.    Declaring that Plaintiffs are the prevailing parties in the DP Case;

G.    Injunctive relief requiring TNDOE and APD to properly and

adequately train the ALJs that will preside over special education due

process cases in special education law and have either counsel that

regularly represent families of a child with a disability participate in

the training or have trainers from outside the State of Tennessee train

the ALJs and appointing a federal monitor to ensure compliance;

H.    Compensatory relief to Plaintiffs for all Defendants' violations of

IDEA;

I.    Declaring that Plaintiffs are entitled to monetary reimbursement for

all expenses incurred by Plaintiffs in the DP Case and herein,

including but not limited to attorney's fees and costs;

J.    An award of attorney's fees and costs for Plaintiffs and granting

Plaintiffs the opportunity to file a fee petition for such award; and

K.    For such other and further relief as the Court deems equitable and just.

## COUNT SEVEN –VIOLATION OF THE TENNESSEE CODE OF JUDICIAL CONDUCT / RECUSAL RULES
### (Defendants APD, ALJ Cambron and ALJ Stovall)

342.   Plaintiffs repeat and reallege the preceding allegations of this

Complaint and incorporate them herein by reference as if set forth in full.

343. "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Tenn. Sup. Ct. R. 10, RJC 2.11(A).

344. ALJ Cambron reassigned the DP Case to ALJ Stovall and knew or should have known that ALJ Stovall had a conflict of interest and could not be an independent hearing officer as defined by IDEA in the DP Case.

345. ALJ Stovall is married to Marsha K. Luey a/k/a Marsha Kay Luey a/k/a Marsha Stovall a/k/a Marsha Luey.

346. Marsha Luey is a School Psychologist for the Metro Nashville Public Schools.

347. Tess Stovall is ALJ Stovall's daughter.

348. Tess Stovall is the Director of Charter Schools for Defendant TNDOE.

349. Tess Stovall, in her role as employee of the TNDOE, was involved in the preparation of the Student Handbook Addendum prepared by the TN State Board of Education.

350. ALJ Stovall received, at least in part, his "required training in special education law" from Melinda Jacobs, Esq., who was counsel for SCS.

351.   Tennessee Supreme Court Rules provide the mechanism for a party to seek disqualification or recusal of a judge on a case, namely a motion for recusal / disqualification.  *See* Tenn. Sup. Ct. R. 10B §1.01.

352.   The rule on recusal applies to ALJs, including ALJ Stovall.  (*See supra* ¶¶93-94.)

353.   ALJ Stovall denied Plaintiffs' motion for recusal / disqualification and refused to remove himself from the DP Case.  (*See supra* ¶¶212-213, 215-218.)

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.   Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.   Declaring that ALJ Stovall violated IDEA by having a conflict of interest and not being an independent hearing officer within the definition of IDEA and therefore should not have presided over or made rulings in the DP Case;

C.   Declaring that ALJ Stovall violated the Tennessee Rules of Judicial Conduct by failing to recuse himself and grant Plaintiffs' motion for recusal / disqualification and that he never should have presided over or made rulings in the DP Case;

D.     Overturning ALJ Stovall's denial of Plaintiffs' motion for recusal / disqualification in the DP Case as error;

E.     Declaring that ALJ Cambron violated IDEA by reassigning the DP Case to ALJ Stovall when she knew or should have known that he had a conflict of interest and could not be an independent hearing officer within the definition of IDEA and therefore should not have presided over or made rulings in the DP Case;

F.     Declaring that the APD violated IDEA by allowing ALJ Stovall to preside over special education due process cases when it knew or should have known that he had a conflict of interest and could not be an independent hearing officer within the definition of IDEA and therefore should not have presided over or made rulings in any special education due process case, including the DP Case;

G.     Declaring that these Defendants violated Plaintiffs' rights under IDEA;

H.     Declaring that, as a result of the violations of IDEA, Defendants denied Plaintiffs the guarantee of the Procedural Safeguards under IDEA and thereby denied Plaintiffs due process of law;

I.     Declaring that Plaintiffs are the prevailing parties in the DP Case;

J.       Injunctive relief preventing the APD or any ALJ to assign ALJ Stovall to any special education due process case in Tennessee due to his conflict of interest and inability to meet the qualifications of an independent hearing officer under IDEA;

K.       Compensatory relief to Plaintiffs for all Defendants' violations of IDEA;

L.       Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

M.       An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

N.       For such other and further relief as the Court deems equitable and just.

## COUNT EIGHT –VIOLATION OF THE BURDEN OF PROOF
### (Defendants ALJ Stovall and SCS)

354.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

355.   The DP Case involved Plaintiffs' seeking reimbursement from SCS for a private placement of D.T. alleging that SCS had failed to provide D.T. with a FAPE.

356.   Plaintiffs bore the burden of proving in the DP Case that SCS did not provide D.T. with a FAPE and that the private placement was appropriate for D.T. given his needs as a child with a disability.  (*See supra* ¶¶51-53.)

357.   Plaintiffs met their burden of proof in the DP Case.  At such point, the burden of proof should have shifted to SCS to prove that either it did provide D.T. with a FAPE or that the private placement was inappropriate.

358.   Despite overwhelming factual evidence presented by Plaintiffs, ALJ Stovall failed to shift the burden of proof in the DP Case.  ALJ Stovall simply failed to require SCS to prove any fact at issue.

359.   One example of many is that Plaintiffs proved that SCS continuously threatened Plaintiffs with truancy charges, which both interfered with Plaintiffs' rights of parental participation in the decisions relating to the education of D.T. and caused coercion and duress of Plaintiffs in forcing them to agree to an improper IEP.  ALJ Stovall failed to shift the burden to SCS to prove that the truancy threats by SCS did not affect Plaintiffs' parental participation or cause coercion in the development of D.T.'s IEP.

360.   SCS knew it could not meet such shifted burden of proof in the DP Case.

361. As a direct and proximate result of ALJ Stovall's failure to shift the burden of proof, Plaintiffs lost the DP Case when they clearly should have won it because SCS would not have been able to meet its burden of proof.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A. Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B. Declaring that ALJ Stovall violated IDEA by failing to shift the burden of proof in the DP Case when, as a hearing officer presiding over a special education due process case, he should have ensured that Plaintiffs' rights were protected;

C. Declaring that these Defendants violated Plaintiffs' rights under IDEA;

D. Declaring that SCS would never have met their burden of proof after Plaintiffs met theirs;

E. Declaring that, as a result of the violations of IDEA, Defendants denied Plaintiffs the guarantee of the Procedural Safeguards under IDEA and thereby denied Plaintiffs due process of law;

F. Declaring that Plaintiffs are the prevailing parties in the DP Case;

G.    Compensatory relief to Plaintiffs for all Defendants' violations of
      IDEA;

H.    Declaring that Plaintiffs are entitled to monetary reimbursement for
      all expenses incurred by Plaintiffs in the DP Case and herein,
      including but not limited to attorney's fees and costs;

I.    An award of attorney's fees and costs for Plaintiffs and granting
      Plaintiffs the opportunity to file a fee petition for such award; and

J.    For such other and further relief as the Court deems equitable and just.

## COUNT NINE –FRAUDULENT MISREPRESENTATION
### (Defendant SCS)

362.    Plaintiffs repeat and reallege the preceding allegations of this
Complaint and incorporate them herein by reference as if set forth in full.

363.    In Tennessee, "homeschooling" is governed by T.C.A. §49-6-3050.

364.    In Tennessee, church-related private schools are governed by T.C.A.
§49-50-801.  Thus, these are not considered "homeschooling" and qualify as
schools that meet the Tennessee Compulsory School Attendance statute.  T.C.A.
§49-6-3001 *et seq*.

365.  TNDOE has established categories of non-public schools[12] that meet the Tennessee Compulsory School Attendance law.  Relevant to this case are Category 2 schools – private schools accredited and approved by TN Board of Education; Category; and Category 4 schools – church-related schools.  (*See* T.C.A. §49-6-3001(c)(3)(A).)

366.  On its website, SCS characterizes "church related . . . non-public schools" as "homeschool programs" subject to  T.C.A. §49-6-3050.  This is legally false.

367.  As a public school that receives both federal and state funding, SCS knew or should have known its characterization of church-related non-public schools is false.

368.  Upon information and belief, SCS' characterization of church-related non-public schools was either negligently or intentionally a false representation of a fact.

369.  SCS made this mischaracterization of church-related non-public schools to block parents from exercising an education option for their children in Tennessee so that SCS could continue to receive the state and federal funding.

---

[12] These categories are publicly available on the TNDOE website at: https://www.tn.gov/education/school-options/non-public-schools/non-public-school-categories.html

370.   SCS knows or should have known that many parents do not have the time, training, and/or competency to 'homeschool' their children.  Thus, the mischaracterization has the effect of making parents believe that Category 4 church-related schools constitutes 'homeschooling' and therefore they avoid enrolling their child in such school.

371.   SCS made this mischaracterization of church-related non-public schools to block parents of children with disabilities, like Plaintiffs in this matter, from exercising an education option for their children, like D.T. in this matter, in Tennessee so that SCS could continue to receive federal funding under IDEA.

372.   Plaintiffs had already notified SCS that they did not feel competent to homeschool D.T.  (*See supra* ¶126.)

373.   Because SCS knew that Plaintiffs did not want to homeschool D.T., SCS never clarified, whether negligently or intentionally, that enrollment of D.T. in a Category 4 school would not be 'homeschooling' and thereby blocked that option for Plaintiffs.

374.   In addition, Plaintiffs made numerous attempts to obtain 'homebound services'[13] from SCS, all of which were denied and rejected by SCS.  (*See supra* ¶¶139, 143, 147, 149, 176, 177.)

---

[13] 'Homebound services' is education provided by a public school in the home of a student with a disability due to a medical need and is different from

375.   Upon information and belief, SCS intentionally omitted the information to Plaintiffs so they did not have an alternative to declare that D.T. was enrolled in a church-related non-public school and thereby avoid truancy charges.  SCS did so in retaliation to and to the detriment and harm of Plaintiffs.

376.   As a direct and proximate result of SCS' mischaracterization of church-related non-public schools and intentional omission of this information to Plaintiffs, Plaintiffs enrolled D.T. in Benton Hall Academy, a very expensive private Category 2 school under T.C.A. §49-6-3001(c)(3)(A)(iii), to avoid further truancy charges.

377.   But for SCS' mischaracterization of church-related non-public schools and intentional omission of this information to Plaintiffs, Plaintiffs would have enrolled D.T. in a church-related non-public school long before D.T. accrued unexcused absences according to SCS and SCS filing truancy charges.  (*See supra* ¶179.)  SCS would have also removed D.T. from enrollment in its elementary school and changed the enrollment to the church-related non-public school.

378.   When Plaintiffs discovered that church-related non-public schools fell under a separate statute and qualified as a school enrollment for D.T., they

---

'homeschooling' where the parents provide the education to the child, regardless of whether that child has a disability or not.

immediately enrolled D.T. at The Farm School so as to mitigate their damages and prevent further truancy charges by SCS. (*See supra* ¶180.)

379.  As a direct and proximate result of SCS' mischaracterization of church-related non-public schools and intentional omission of this information to Plaintiffs, Plaintiffs were convicted of truancy charges regarding D.T.'s unexcused absences at SCS.

380.   As a direct and proximate result of SCS' mischaracterization of church-related non-public schools and intentional omission of this information to Plaintiffs, Plaintiffs had to battle a long and expensive due process case which they should have won.

381.  As a direct and proximate result of SCS' mischaracterization of church-related non-public schools and intentional omission of this information to Plaintiffs, Plaintiffs have had to file a federal action challenging SCS' interpretation of schools that qualify under the Tennessee Compulsory School Attendance statute against private placement under IDEA pursuant to the federal preemption doctrine and incur substantial expenses relating thereto.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against Defendant SCS as follows:

A.    Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as obtained due to SCS' fraudulent misrepresentation;

B.     Compensatory damages in the amount of $5,000,000.00;

C.     Punitive damages in the amount of $15,000,000.00;

D.     An award of attorney's fees and costs for Plaintiffs and granting

Plaintiffs the opportunity to file a fee petition for such award; and

E.     For such other and further relief as the Court deems equitable and just.

## COUNT TEN – APPELLATE REVIEW: LEGAL ERRORS
### (Defendants ALJ Cambron, ALJ Stovall and SCS)

382.   Plaintiffs repeat and reallege the preceding allegations of this

Complaint and incorporate them herein by reference as if set forth in full.

383.   Alleged legal errors must be reviewed *de novo*.  (*See supra* ¶22.)

384.   The following legal errors were committed by ALJ Cambron in the

DP Case and should be overturned, vacated or reversed:

a.     That the Tennessee Uniform Administrative Procedures Act, the

Uniform Rules of Procedure for Hearing Contested Cases before State

Administrative Agencies, the Tennessee Rules of Civil Procedure, and

Tennessee Rules of Evidence applied in the DP Case in her 4/26/2018

Order;

b.     Stating that the parties agreed to waive the 45-day hearing deadline in

her 6/21/2018 and 7/13/2018 Orders;

c.     Setting deadlines in the 7/13/2018 Pre-Hearing Order that violated the

45 Day Rule and allowing discovery in the DP Case;

d.      Granting SCS' Motion to Compel Discovery and allowed formal discovery, including depositions, in her 8/14/2018 phone conference;

e.      Granting SCS' Motion to Dismiss certain claims in her 9/19/2018 Order;

f.      Denying Plaintiffs' Motion to Amend their DP Complaint in her 9/19/2018 Order;

g.      Granting SCS' Motion to Observe D.T. in her 9/19/2018 Order;

h.      Ruling that the subpoena for D.T.'s medical records was permitted and did not violate HIPAA in her 9/19/2018 Order;

i.      Granting SCS' Second Motion to Compel Discovery and threatening taxation of costs against any party who resists discovery in the future in her 11/21/2018 Order;

j.      Denying Plaintiffs' Motion to Reconsider the 11/21/2018 Order on discovery and granting SCS' Motion to Tax Costs for responding to the motion in her 12/20/2018 Order;

k.      Failing to address Plaintiffs' Motion for Partial Summary Judgment or other pending motions as of February 2019; and

l.      Reassigning the case *sua sponte* to ALJ Stovall without explanation or notice to the parties on 2/11/2019.

385. The following legal errors were committed by ALJ Stovall in the DP Case prior to the Final Order and should be overturned, vacated or reversed:

a.  Denying Plaintiffs' Motion for Recusal / Disqualification of ALJ Stovall on 2/20/2019 and by Order dated 3/1/2019;

b.  Denying Plaintiffs' Motion for Partial Summary Judgment in his 1/9/2020 Order;

c.  Granting SCS' Third Motion to Compel Discovery in his 1/9/2020 Order;

d.  Denying Plaintiffs' Motion to Exclude Evidence and for Sanctions in his 1/24/2020 Order;

e.  Denying in part Plaintiffs' Motion for Protective Order in his 1/24/2020 Order;

f.  Requiring Plaintiffs' witnesses to bring additional discovery to the hearings with them or they would be barred from testifying in his 1/24/2020 Order;

g.  Permitting 8 days of hearings in the DP Case; and

h.  Setting a post-hearing briefing schedule and final decision date that violated the 45 Day Rule on the record.

386. The following legal errors were committed by ALJ Stovall in the 6/292020 Final Order and should be overturned, vacated or reversed:

a. "When a parent files a due process complaint, the parent bears the burden of proof, or burden of persuasion, in the due process hearing" as incorrectly stating the burden of proof in the DP Case;

b. That Plaintiffs bore the burden of proving that SCS failed to comply "with all procedural requirements in the development of the IEP of December 13, 2017" as incorrectly stating the burden of proof in the DP Case;

c. That Plaintiffs "failed to carry their burden of proof on either of these allegations";

d. That SCS complied with the evaluation requirements of IDEA;

e. That Plaintiffs were given meaningful participation in the IEP process by SCS;

f. That emails are the determinative factor of whether Plaintiffs were given meaningful participation in the IEP process by SCS;

g. Failing to address the impact of the threats of truancy on Plaintiffs' parental participation in the IEP process;

h. That SCS' refusal to provide Plaintiffs with the testing protocols of D.T. was not a violation of Plaintiffs' procedural rights;

i.  That SCS' failure to consider or input the recommendations of Plaintiffs' outside experts into D.T.'s IEP was not a violation of IDEA or denial of FAPE;

j.  That SCS' failure to consider or put 1:1 ABA therapy into D.T.'s IEP was not a violation of IDEA or denial of FAPE;

k.  That SCS' failure to consider or put sufficient occupational therapy into D.T.'s IEP was not a violation of IDEA or denial of FAPE;

l.  That SCS' failure to consider or put sufficient or appropriate speech and language therapy into D.T.'s IEP was not a violation of IDEA or denial of FAPE;

m.  That SCS' failure to consider or put ESY services into D.T.'s IEP was not a violation of IDEA or denial of FAPE;

n.  That SCS' failure to provide ESY services to D.T. during school recess periods was not a violation of IDEA or denial of FAPE;

o.  That SCS' failure to consider, include, or develop a transition plan from his private placement back to the public school setting into D.T.'s IEP was not a violation of IDEA or denial of FAPE;

p.  By ruling that the 12/13/2017 IEP met the "appropriately ambitious" standard of *Endrew F* for the provision of FAPE;

q.  Granting more weight to SCS' experts, who only observed D.T. for less than 2 hours and who did not evaluate or recommend therapies for D.T., over Plaintiffs' experts, who spent years evaluating and providing therapies to D.T., and making his Final Order primarily based on SCS's experts' opinions;

r.  That the program at SCS was the Least Restrictive Environment for D.T. and complied with IDEA in that respect;

s.  By using the incorrect standard for determining what constitutes the Least Restrictive Environment under IDEA;

t.  By failing to accept the uncontradicted testimony regarding D.T.'s experiences at Goodpasture, Edison, or Vena Stuart;

u.  By confusing the concepts of recommended services with placement;

v.  That D.T.'s program at HOPE was not appropriate for D.T., acceding to the opinions of SCS' expert witnesses despite their lack of knowledge or data to support those opinions;

w.  By failing to cite or rely upon *Deal v. Hamilton County Bd. of Educ.,* 392 F.3d 840, 855 (6th Cir. 2004), when that case is on all fours with the DP Case on the issues of placement, LRE, 1:1 ABA Therapy, and services for children with Autism;

x.    Citing to and relying upon the judgment of the juvenile court judge on the issue of placement, when that judge respectfully and admittedly had no understanding or knowledge of IDEA law;

y.    Misstating the law on unilateral, private placement of children with disabilities as applied to D.T.;

z.    Concluding that Plaintiffs' claims under §504 and the ADA were without merit;

aa.   By making a ruling on Tennessee's Compulsory School Attendance Law when that issue was not before ALJ Stovall and was already pending in the related federal court action;

bb.   By ignoring and failing to address SCS' threats of truancy as coercion to force Plaintiffs to enter into an inappropriate IEP, which is akin to the defenses of coercion and duress in contract disputes;

cc.   By denying that SCS failed to provide D.T. with a FAPE;

dd.   By denying Plaintiffs' claim for reimbursement for a proper private placement of D.T.; and

ee.   For ruling that SCS is the prevailing party in the DP Case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.    Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.    Declaring that ALJ Cambron and ALJ Stovall made legal errors in the DP Case;

C.    Declaring that SCS unfairly benefitted from the legal errors in the DP Case;

D.    Declaring that Plaintiffs are entitled to judgment as a matter of law;

E.    Declaring that Plaintiffs are the prevailing parties in the DP Case;

F.    Award of reimbursement for all costs associated with the private placement of D.T. in accordance with the record and any supplemental evidence;

G.    Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

H.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

I.    For such other and further relief as the Court deems equitable and just.

## COUNT ELEVEN – APPELLATE REVIEW: FACTUAL ERRORS
### (Defendants ALJ Stovall and SCS)

387.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

388. The following clearly erroneous factual errors were committed by ALJ Stovall in the 6/292020 Final Order and should be overturned, vacated or reversed:

a.   By finding that the "primary complaint of the Petitioners would appear to be that the IEP did not adopt **all** the private recommendations, most importantly those made by Dr. McCarton";

b.   By finding that "B.H.T. wanted a continuation of the home-based one to one ABA therapy and nothing else would suffice";

c.   By finding that "the staff at Vena Stuart and Dr. Rostetter all noted that D.T. was making progress in meeting the IEP goals during his time at Vena Stuart";

d.   By finding that Dr. Rostetter had sufficient knowledge or data to opine on whether D.T. was making progress in meeting the IEP goals during his time at Vena Stuart;

e.   By finding that Plaintiffs "offered little compelling evidence as to why D.T. could not be educated in a school setting";

f.   By misstating the opinion of Dr. McCarton on the issue of Least Restrictive Environment and confusing recommended services with placement;

g.  By finding that "Dr. McCarton believed the only appropriate learning environment for D.T. was the **most** restrictive available, home-based one to one therapy with no interaction with his peers";

h.  By misstating the facts and motives surrounding Melanie Webster and her pursuit of truancy charges against Plaintiffs, in particular the misrepresentations regarding placement made by Ms. Webster to Plaintiffs and the history of Ms. Webster's antagonism towards Plaintiffs as affecting the threats of truancy and coercion to enter into an inappropriate IEP; and

i.  By failing to accurately state the duration and extent of regression experienced by D.T. while at SCS.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.  Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.  Declaring that ALJ Stovall made clear factual errors in the DP Case;

C.  Declaring that SCS unfairly benefitted from the clear factual errors in the DP Case;

D.  Declaring that Plaintiffs are entitled to judgment as a matter of law;

E.  Declaring that Plaintiffs are the prevailing parties in the DP Case;

F.     Award of reimbursement for all costs associated with the private placement of D.T. in accordance with the record and any supplemental evidence;

G.     Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

H.     An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

I.     For such other and further relief as the Court deems equitable and just.

## COUNT TWELVE – DENIAL OF FAPE
### (Defendant SCS)

389.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

390.   SCS violated IDEA and its regulations and denied D.T. a FAPE as follows:

a.   By failing to design an appropriately ambitious IEP for D.T. in light of his circumstances, including without limitation failing to include 1:1 ABA Therapy and sufficient Occupational Therapy to meet D.T.'s needs;

b.   By coercing Plaintiffs to agree to an inappropriate IEP under threats of criminal truancy charges and thereby denying Plaintiffs' their Procedural Safeguard of adequate parental participation;

c.  By denying Plaintiffs numerous Procedural Safeguards;

d.  For retaliating against Plaintiffs by threatening, ultimately filing, and obtaining a conviction for truancy charges against them for placing D.T. in a facility other than SCS's schools because Plaintiffs exerted their legal rights under the various special education laws;

e.  For predetermination of placement and services for D.T. in violation of the law;

f.  For predetermination of D.T.'s IEP causing substantive harm to D.T.'s education as proven by extensive regression;

g.  By failing to offer Extended School Year (ESY) services to D.T. when he was clearly exhibiting regression and was entitled to ESY;

h.  By failing to heed the recommendations and evaluations of medical professionals and licensed therapists;

i.  By failing to appropriately evaluate D.T. for all of his needs;

j.  By failing to assess and address all of D.T.'s needs;

k.  By blocking and impeding Plaintiffs' parental participation in the IEP process and as members of the IEP team;

l.  By failing to consider the input of D.T.'s parents in development of D.T.'s IEPs;

m. By failing to consider outside evaluations in development of D.T.'s IEPs;

n. By refusing to reimburse Plaintiffs for the home-based services and program that provided D.T. with a FAPE;

o. By failing to accept the home-based services and program as satisfying the attendance requirements of SCS;

p. By filing truancy charges against Plaintiffs;

q. By manipulating the homebound services intake process by using non-standard, unofficial, unsigned forms as the basis to deny Plaintiffs' homebound services request;

r. By failing to call IEP meetings following Plaintiffs' requests for homebound services in accordance with the law;

s. By failing to convene an IEP meeting within 10 school days upon receipt of Plaintiffs' request for homebound services;

t. By failing to assist Plaintiffs to quash threats of truancy despite SCS's knowledge that Plaintiffs were in substantial compliance with Tennessee's Compulsory Attendance laws;

u. By failing to provide Plaintiffs with the purported SCS policy on appealing denials of requests for excusing attendance;

v. By falsely stating that SCS has a policy on appealing denials of requests for excusing attendance;

w. By SCS's website failing to address that Homebound placements for children receiving special education are handled differently than those of non-disabled students, which is discriminatory in both policy and practice;

x. By having SCS's attorney Melinda Jacobs attend the 12/5/17 IEP meeting in violation of T.C.A. §49-10-607 and contrary to the guidance of the U.S. Department of Education that "the attendance of attorneys at IEP meetings should be strongly discouraged" in *Letter to Clinton*, July 23, 2001;

y. By failing to determine that Vena Stuart Elementary was not the least restrictive environment for D.T.;

z. By failing to determine that home-based services and program <u>was</u> the least restrictive environment for D.T.;

aa. By failing to determine that home-based services and program was appropriate for D.T.;

bb. By failing to accept Plaintiffs as equal members of the IEP team;

cc. By failing to accept valid data from outside sources and its own observations of D.T. in the home-based program;

dd. By failing to modify the approach to D.T.'s education when it was clear that the current approach was not appropriate for D.T. and D.T. was not meeting his goals in his IEP;

ee. By failing to conduct a Functional Behavioral Assessment ("FBA") of D.T.; and

ff. By failing to develop appropriate goals for D.T. instead of setting him up for failure.

391.  As a direct and proximate result of these violations, D.T. has been denied a FAPE by SCS.

392.  As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded the D.T.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to D.T., and caused a deprivation of educational benefits to D.T.

393.  As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP Case.

394.  As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS'

favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against SCS as follows:

A. Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B. Declaring that SCS substantively violated IDEA denying D.T. a FAPE;

C. Declaring that, because SCS violated Plaintiffs' procedural rights under IDEA, it impeded the D.T.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to D.T., and caused a deprivation of educational benefits to D.T.;

D. Declaring that Plaintiffs had a legal right under IDEA to unilaterally place D.T. in a private placement and that such private placement was appropriate for D.T.;

E. Awarding Plaintiffs reimbursement for all tuition, transportation costs, and other fees and costs associated with the private placement from February 2018 to the present;

F. Declaring that Plaintiffs are the prevailing parties herein;

G.      Compensatory education services and relief to Plaintiffs for all SCS'

violations of IDEA;

H.      Declaring that Plaintiffs are entitled to monetary reimbursement for

all expenses incurred by Plaintiffs in the DP Case and herein,

including but not limited to attorney's fees and costs;

I.      An award of attorney's fees and costs for Plaintiffs and granting

Plaintiffs the opportunity to file a fee petition for such award; and

J.      For such other and further relief as the Court deems equitable and just.

## COUNT THIRTEEN – PROCEDURAL VIOLATIONS OF IDEA
## CONSTITUTING DENIAL OF FAPE
### (Defendant SCS)

395.   Plaintiffs repeat and reallege the preceding allegations of this

Complaint and incorporate them herein by reference as if set forth in full.

396.   As a direct and proximate result of the aforementioned violations,

Plaintiffs have been harmed because the procedural violations impeded the D.T.'s

right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the

decision-making process regarding the provision of FAPE to D.T., and caused a

deprivation of educational benefits to D.T.

397.   As a direct and proximate result of the aforementioned violations,

Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees

and costs in the DP Case.

398.  As a direct and proximate result of the aforementioned violations, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against SCS as follows:

A.  Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.  Declaring that SCS substantively violated IDEA denying D.T. a FAPE;

C.  Declaring that, because SCS violated Plaintiffs' procedural rights under IDEA, it impeded the D.T.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to D.T., and caused a deprivation of educational benefits to D.T.;

D.  Declaring that Plaintiffs had a legal right under IDEA to unilaterally place D.T. in a private placement and that such private placement was appropriate for D.T.;

E.    Awarding Plaintiffs reimbursement for all tuition, transportation costs, and other fees and costs associated with the private placement from February 2018 to the present;

F.    Declaring that Plaintiffs are the prevailing parties herein;

G.    Compensatory education services and relief to Plaintiffs for all SCS' violations of IDEA;

H.    Declaring that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

I.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

J.    For such other and further relief as the Court deems equitable and just.

## COUNT FOURTEEN – SYSTEMIC VIOLATION OF THE INDEPENDENCE OF THE ADJUDICATING BODY OF SPECIAL EDUCATION DISPUTES
### (All Defendants)

399.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

400.    TNDOE is an executive branch agency of the State of Tennessee.

401.    TNDOE is the SEA for Tennessee.  *See* 20 U.S.C. §1401(32).

402.   IDEA requires hearing officers conducting special education due process hearings may not be employees of the SEA or the LEA involved in the education or care of the child or a person having a conflict of interest.

403.   SCS is the LEA in the DP Case.

404.   TNDOE has designated the APD as the adjudicating body that provides the ALJs to preside over special education due process hearings.

405.   The APD is an executive branch agency of the State of Tennessee.

406.   Although not technically employees of the TNDOE, ALJs are employees of the APD.

407.   Most ALJs assigned by the APD to preside over special education due process hearings have been trained by Melinda Jacobs, former counsel to many of the LEAs in Tennessee.

408.   Upon information and belief, none of the ALJs assigned by the APD to preside over special education due process hearings have been trained by or formerly represented children with disabilities and their families in special education due process cases in the State of Tennessee.

409.   ALJs Cambron and Stovall are employees of the State of Tennessee.

410.   Since the budget and salaries of TNDOE and APD employees are subparts of and determined by the larger budget of the executive branch, they are beholden to the same pot of money.  This creates a personal and/or professional

interest that conflicts with the ALJ's objectivity in special education due process hearings.

411. A portion of the executive branch budget is funded by the U.S. Government through IDEA.

412. Since LEAs, including SCS, receive funds from the Tennessee executive branch budget, the TNDOE, APD, and ALJs assigned to special education due process hearings have a professional interest to preserve and protect those funds and that budget, which conflicts with the independence required by IDEA in special education due process hearings. Specifically, the financial interest of these executive branch agencies and their employees conflicts with their objectivity in special education due process hearings, which is to comply with IDEA and the needs of students with disabilities and their families that might cost the State of Tennessee money. This creates an "unholy alliance" between TNDOE, the APD, the ALJs, and the LEAs.

413. ALJs Cambron and Stovall have a personal interest, namely that the State of Tennessee pays their wages, which conflicts with their objectivity in special education due process hearings as a decision in favor of a child with a disability and his/her family might reduce or impact the availability of the State of Tennessee to pay those wages.

414.   TNDOE's method for resolving special education disputes is a systemic violation of IDEA and the civil rights of children with disabilities and their families.

415.   In the 2004 reauthorization and amendments of IDEA, Congress found "Parents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways."  20 U.S.C. §1400(c)(8).

416.   To that end, one of the central purposes of IDEA is "to ensure that the rights of children with disabilities and parents of such children are protected," 20 U.S.C. §1400(d)(1)(B), i.e. to level the playing field between families and schools.

417.   With respect to the special education of D.T., Defendants TNDOE, the APD, SCS, and ALJs Cambron and Stovall were all acting under color of state law.

418.   As a direct and proximate result of this unholy alliance among Defendants, LEAs/school districts, specifically SCS in the DP Case, and their counsel get preferential treatment on motions and other matters in special education due process hearings from ALJs. This is evident by how ALJs Cambron and Stovall did not enforce any of the regulations against SCS in the DP Case.

419.   As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of independence of the adjudicating body in Tennessee special education due process hearings by ALJs Cambron and Stovall make every ruling in

favor of SCS and against Plaintiffs, even when the law and regulations were clearly in Plaintiffs' favor.

420.   As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of independence of the adjudicating body in Tennessee special education due process hearings because SCS unfairly benefitted from invalid rulings that enabled it to win the DP Case.

421.   As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of independence of the adjudicating body in Tennessee special education due process hearings because SCS was permitted to pursue and convict Plaintiffs of truancy charges when Plaintiffs had lawfully exercised their rights to unilaterally, privately place D.T. and seek reimbursement therefor.

422.   TNDOE's systemic violations of IDEA have caused Plaintiffs damages.  Specifically, Plaintiffs have been denied a FAPE for numerous legal errors in the DP Case.  Plaintiffs are entitled to all appropriate relief as a result of this harm.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.   Overturning and/or vacating ALJ Stovall's July 16, 2020 Decision as error;

B.    Declaring that there is an unholy alliance among Defendants creating a lack of independence of the adjudicating body in Tennessee special education due process hearings and thereby violating the basic tenets of IDEA and its regulations;

C.    Declaring that because of the lack of independence of the adjudicating body in Tennessee special education due process hearings, SCS unfairly benefitted from erroneous rulings by the APD, ALJs Cambron and Stovall in the DP Case;

D.    Declaring that the lack of independence of the adjudicating body in Tennessee special education due process hearings caused Plaintiffs to lose the DP Case;

E.    Finding that Plaintiffs' are entitled to judgment as a matter of law;

F.    Finding that Plaintiffs are the prevailing parties in the DP Case;

G.    Declaring that Defendants are in direct violation of IDEA, its regulations, and the Tennessee regulations by creating a system that lacks independence of the adjudicating body for special education due process hearings;

H.    Finding that the APD and all ALJs handling special education due process hearings have an inherent conflict of interest in adjudicating special education due process hearings;

I.  Finding that TNDOE has violated IDEA and its regulations by designating the APD, another executive branch agency, as the adjudicating body for special education due process hearings due to the inherent conflict of interest which existed *ab initio*;

J.  Injunctive relief that the APD and all ALJs cease and desist handling Tennessee special education due process hearings;

K.  Injunctive relief that TNDOE cease and desist transmitting special education due process hearings to the APD;

L.  Injunctive relief that TNDOE immediately fund and create a truly independent system for adjudicating special education due process hearings in the State of Tennessee that ensures compliance with IDEA;

M.  Compensatory relief to Plaintiffs for the Defendants' violations of IDEA, the federal regulations, and the Tennessee regulations;

N.  Compensatory damages in the amount of $5,000,000.00;

O.  Punitive damages in an amount in excess of $20,000,000.00;

P.  Finding that Plaintiffs are entitled to monetary reimbursement for all expenses incurred by Plaintiffs in the DP Case and herein, including but not limited to attorney's fees and costs;

Q.      An award of attorney's fees and costs for Plaintiffs and granting

        Plaintiffs the opportunity to file a fee petition for such award; and

R.      For such other and further relief as the Court deems equitable and just.

## <u>COUNT FIFTEEN – SYSTEMIC ABUSE OF PROCESS</u>
### (All Defendants)

423.    Plaintiffs repeat and reallege the preceding allegations of this

Complaint and incorporate them herein by reference as if set forth in full.

424.    Defendants have an ulterior motive with respect to special education

in the State of Tennessee.  Specifically, despite the laws that protect students with

disabilities and the mandate to comply with such laws, Defendants seek to protect

their budgets from the costs of such compliance.

425.    Provision of special education services are expensive and with a

growing population or identification of children with disabilities in the public

school systems, that expense is growing faster than the public school budgets.

426.    Defendants also know that there is little to no oversight in their

compliance with special education laws, as discussed at length *supra, e.g.* the

systemic violation of the 45 Day Rule.

427.    The public school system in Tennessee seeks to protect non-essential

expenses like extracurricular activities, administration salaries and benefits, and the

purchase of new curriculum materials instead of recycling of existing materials and

books.

428.   In addition, the system in Tennessee is designed to favor Defendants and extended litigation, when the purposes of special education law and the due process system is intended to restore the balance of interests and protect families of a child with a disability, like Plaintiffs herein, especially when they may bring a complaint *pro se* or with an attorney who is handling the case *pro bono* or on a reduced fee basis.

429.   Indeed, the public school systems in Tennessee are purchasing insurance to pay or pay out of pocket for defense fees and costs in special education cases to avoid incurring the expenses associated with special education services.

430.   In every respect, the system of special education due process cases in Tennessee is designed to protect the finances of Defendants to the detriment of Plaintiffs and families like them who simply want to enforce their legal rights under special education laws.  Thus, Defendants have this ulterior motive of protecting the education budgets, both locally and statewide, to the loss of special education services to D.T. and other students with disabilities.

431.   Defendants have exhibited this ulterior motive by repeatedly, not just in the DP Case but in many other cases,[14] by fighting special education due process cases with extraordinary vigor, similar to that of gun or tobacco litigation. This methodology is completely out of sync with the letter and spirit of special education laws.

432.   The purpose of Defendants establishing this 'no-win' situation for Plaintiffs and families like them is that they know most parents cannot afford to fight long litigation battles and will either not file them initially or will give up before they are completed. This accomplishes Defendants' ulterior motive in that the school budgets are saved from special education services. Legal expenses can be accommodated and hidden in budgets in other ways.

433.   Defendants have created, enforced, and used the Tennessee system for resolving special education disputes to discourage Plaintiffs and families like them from pursuing their legal rights on behalf of D.T. and other students with disabilities by turning the cases into major litigations, when IDEA both expressly and implicitly requires them to be rapid, fact-finding hearings to address instead of large-scale civil actions. Examples of this in the DP Case include without

---

[14] *See, e.g., Sumner County Board Of Education v. LD ex rel. CK,* U.S.D.C. M.D.Tenn., Civil No. 3:18-cv-00613 (April 29, 2019); *Sagan v. Sumner County Board of Educ.*, 726 F. Supp. 2d 868 (M.D.Tenn. 2010).

limitation the extended Scheduling Orders; the allowance of discovery, especially depositions, subpoenae, and use of experts; observations of a child; the 8 days of hearings; the lengths of witness testimony; motion practice; and the refusal of ALJ Stovall to recuse himself from special education cases when there is a blatant and obvious conflict of interest.

434.   In essence, Defendants, particularly SCS, have used the special education due process hearing and the DP Case other than as would be and should be proper under IDEA and its regulations.  Defendants have abused the process.

435.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have suffered serious damages including special and general damages according to proof.

436.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have been harmed because SCS has been permitted to deny SCS a FAPE; block Plaintiffs' unilateral private placement of D.T.; pursue truancy charges and obtain a conviction of such charges against Plaintiffs; and otherwise prosecute a special education due process case outside the boundaries of IDEA and its regulations, all with the imprimatur of Defendants.

437.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees

and costs in enforcing their special education legal rights against SCS who was wrongfully subverting them.

438.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.   Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B.   Declaring that Defendants have abused the process and violated Plaintiffs' rights thereby;

C.   Compensatory damages in the amount of $5,000,000.00;

D.   Punitive damages in an amount in excess of $20,000,000.00;

E.   An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

F.   For such other and further relief as the Court deems equitable and just.

## COUNT SIXTEEN – VIOLATION OF §504
### (Defendants ALJ Cambron, ALJ Stovall and SCS)

439.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

440. §504 prohibits discrimination of children with disabilities in school and ensures that their civil rights are not violated.

441. §504 prohibits discrimination of children with disabilities by any public entity.

442. Denial of FAPE to a child with a disability is discrimination and a violation of §504. 34 C.F.R. §104.4.

443. Retaliation by a public entity or official when a parent or child with a disability engages in a protected activity such as enforcing special education legal rights is a violation of §504. 29 C.F.R. §33.13; 34 C.F.R. §100.7(e); 34 C.F.R. §104.61.

444. D.T. has a "disability" as defined in §504 as his medical condition is a mental impairment which substantially limits one or more of his major life activities, including but not limited to learning and communicating. 29 U.S.C. §705(20)(B).

445. D.T. is an "individual with a disability" within the meaning of §504 because D.T.'s diagnosis of his medical condition substantially limits his ability to learn, communicate, and be educated. 29 U.S.C. §705(20)(A); 34 C.F.R. §104.3(j).

446. D.T. is entitled to the protections against discrimination as provided by §504 and shall not, by reason of his disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 29 U.S.C. §794(a); 34 C.F.R. §§104.4, 104.31 and 104.33.

447. Upon information and belief during all relevant time periods herein, SCS received federal funds to operate as a public facility providing education to the residents within its jurisdiction.

448. ALJs Cambron and Stovall are employed by the APD and appointed by the TNDOE and are therefore representatives of a public entity that provides public services.

449. SCS knew of D.T.'s disability because of his IEP, which requires a determination of eligibility of a child with a disability.

450. By denying D.T. equal access to educational services, including but not limited to a denial of FAPE to D.T., and by subjecting D.T. to a hostile situation with SCS, SCS violated D.T.'s rights under §504 and the regulations promulgated thereunder.

451. By denying D.T. equal access to educational services, including but not limited to a denial of FAPE to D.T., and by subjecting Plaintiffs to a hostile situation with SCS, SCS violated Plaintiffs' rights under §504 and the regulations promulgated thereunder.

452. By retaliating against Plaintiffs for asserting and enforcing their special education legal rights by filing and pursuing truancy charges against Plaintiffs, SCS violated Plaintiffs' rights under §504 and the regulations promulgated thereunder.

453. By denying Plaintiffs due process of law and a fair administrative hearing, including but not limited to rejecting that SCS denied a FAPE to D.T., and by subjecting Plaintiffs to hostile administrative proceedings, ALJs Cambron and Stovall violated D.T.'s rights under §504 and the regulations promulgated thereunder.

454. By retaliating against Plaintiffs for asserting and enforcing their special education legal rights by finding against Plaintiffs contrary to all of the evidence in their favor, ALJs Cambron and Stovall violated Plaintiffs' rights under §504 and the regulations promulgated thereunder.

455. As a direct and proximate result of these Defendants violations of §504 and the regulations promulgated thereunder, Plaintiffs have suffered serious damages including special and general damages according to proof.

456. As a direct and proximate result of these Defendants violations of §504 and the regulations promulgated thereunder, Plaintiffs have been harmed because SCS has been permitted to deny SCS a FAPE; block Plaintiffs' unilateral private placement of D.T.; pursue truancy charges and obtain a conviction of such

charges against Plaintiffs; and otherwise prosecute a special education due process case outside the boundaries of IDEA and its regulations, all with the imprimatur of ALJs Cambron and Stovall.

457. As a direct and proximate result of the aforementioned violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in enforcing their special education legal rights against SCS who was wrongfully subverting them.

458. As a direct and proximate result of the aforementioned violations, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A. Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B. Declaring that these Defendants have violated §504 and Plaintiffs' rights thereunder;

C. Compensatory damages in the amount of $5,000,000.00;

D. An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

E.     For such other and further relief as the Court deems equitable and just.

## COUNT SEVENTEEN – VIOLATION OF ADA
### (Defendants ALJ Cambron, ALJ Stovall and SCS)

459.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

460.   The ADA prohibits discrimination of children with disabilities in school and ensures that their civil rights are not violated.

461.   The ADA prohibits discrimination of children with disabilities by any public entity.

462.   Denial of FAPE to a child with a disability is discrimination and a violation of the ADA.  28 C.F.R. §35.130.

463.   The ADA prohibits retaliation, coercion or threats against people who file complaints under the ADA or otherwise engage in a protected activity.  42 U.S.C. §12203; 28 C.F.R. §35.134.

464.   Enforcing special education rights under IDEA, §504, the ADA, or other civil rights laws is a protected activity.

465.   As a child with a serious medical condition, D.T. has a "disability" as the disorder substantially limits one or more of his major life activities, including but not limited to learning and communicating, as set forth in the ADA. 42 U.S.C. §12102(1); 28 C.F.R. §35.104.

466. D.T. is a "qualified individual with a disability" within the meaning of the ADA. 42 U.S.C. §§12132 and 12182; 28 C.F.R. §§35.130 and 35.149.

467. D.T. is entitled to the protections against discrimination as provided by the ADA and shall not, by reason of his disability, be denied public accommodations or excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. §§12132, 12181 and 12182; 28 C.F.R. §§35.130 and 35.149.

468. SCS, like all educational facilities receiving federal funds, is a public accommodation. 42 U.S.C. §12181(7)(j).

469. ALJs Cambron and Stovall are employed by the APD and appointed by the TNDOE and are therefore representatives of a public entity that provides public services.

470. SCS failed in its responsibilities under the ADA and the regulations promulgated thereunder to provide its services, programs and activities in a full and equal manner to D.T., a disabled person, as described hereinabove, including failing to ensure that educational services are provided on an equal basis to a child with a disability and free of hostility towards D.T.'s disability.

471. SCS further failed in its responsibilities under the ADA to provide its services, programs and activities in a full and equal manner to D.T., a disabled person, as described hereinabove, by willfully failing to address all of his needs.

472. By denying D.T. equal access to educational services, including but not limited to a denial of FAPE to D.T., and by subjecting D.T. to a hostile situation with SCS, SCS violated D.T.'s rights under the ADA and the regulations promulgated thereunder.

473. By denying D.T. equal access to educational services, including but not limited to a denial of FAPE to D.T., and by subjecting Plaintiffs to a hostile situation with SCS, SCS violated Plaintiffs' rights under the ADA and the regulations promulgated thereunder.

474. By retaliating against Plaintiffs for asserting and enforcing their special education legal rights by filing and pursuing truancy charges against Plaintiffs, SCS violated Plaintiffs' rights under the ADA and the regulations promulgated thereunder.

475. By denying Plaintiffs due process of law and a fair administrative hearing, including but not limited to rejecting that SCS denied a FAPE to D.T., and by subjecting Plaintiffs to hostile administrative proceedings, ALJs Cambron and Stovall violated D.T.'s rights under the ADA and the regulations promulgated thereunder.

476. By retaliating against Plaintiffs for asserting and enforcing their special education legal rights by finding against Plaintiffs contrary to all of the evidence in their favor, ALJs Cambron and Stovall violated Plaintiffs' rights under the ADA and the regulations promulgated thereunder.

477. As a direct and proximate result of these Defendants violations of the ADA and the regulations promulgated thereunder, Plaintiffs have suffered serious damages including special and general damages according to proof.

478. As a direct and proximate result of these Defendants violations of the ADA and the regulations promulgated thereunder, Plaintiffs have been harmed because SCS has been permitted to deny SCS a FAPE; block Plaintiffs' unilateral private placement of D.T.; pursue truancy charges and obtain a conviction of such charges against Plaintiffs; and otherwise prosecute a special education due process case outside the boundaries of IDEA and its regulations, all with the imprimatur of ALJs Cambron and Stovall.

479. As a direct and proximate result of the aforementioned violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in enforcing their special education legal rights against SCS who was wrongfully subverting them.

480. As a direct and proximate result of the aforementioned violations, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final

Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

481.   SCS' actions were engaged in with malice and/or reckless indifference to Plaintiffs' rights.

482.   The actions of ALJs Cambron and Stovall were engaged in with malice and/or reckless indifference to Plaintiffs' rights.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

G.   Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

H.   Declaring that these Defendants have violated the ADA and Plaintiffs' rights thereunder;

I.   Compensatory damages in the amount of $5,000,000.00;

J.   Punitive damages in an amount in excess of $20,000,000.00;

K.   An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

L.   For such other and further relief as the Court deems equitable and just.

## COUNT EIGHTEEN – §1983 SYSTEMIC CIVIL RIGHTS VIOLATIONS
### (All Defendants)

483.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

484.    Congress intended that IDEA rights be enforceable under 42 U.S.C. §1983.

485.    Any person, including without limitation a school district, school board of education, local educational agency, state educational agency, and/or arm of the state government, who subjects or causes to be subjected a U.S. citizen to the deprivation of that citizen's Constitutional rights and/or privileges shall be liable to such citizen in an action at law, suit in equity, or other proceeding for redress. 42 U.S.C. §1983.

486.    Plaintiffs have a cause of action under §1983 if a school district, school board of education, local educational agency, state educational agency, and/or arm of the state government has a policy or custom that caused the violation of their constitutional rights, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), or, under the state-created danger theory. *See Sanford v. Stiles,* 456 F. 3d 298 (3d Cir. 2006); *Kneipp v. Tedder,* 95 F. 3d 1199 (3d Cir. 1996).

487.    Defendants were acting within the course and scope of their employment and/or under the color of state law at all material times.

488.    Defendants have denied Plaintiffs their right to due process of law.

489.    Defendants have denied Plaintiffs their right to a determination of their special education claims against school districts and/or local education

agencies by failing to comply with IDEA, its regulations, and the Tennessee regulations.

490. Defendants have denied Plaintiffs their right to a determination of their special education claims against school districts and/or local education agencies by failing to enforce the regulatory timeline under IDEA.

491. Defendants have denied Plaintiffs their right to timely assert other claims because of the delays and systemic flaws.

492. Defendants violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by actions, including but not limited to, depriving Plaintiffs equal protection under the law on the basis of disability.

493. Defendants violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution by actions, including but not limited to, acting with deliberate indifference to the risk of harm to Plaintiffs by delaying and/or failing to timely address special education problems in SCS and leaving D.T. with virtually no options to obtain a FAPE other than unilateral placement and seeking reimbursement therefor.

494. Defendants violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution by actions, including but not limited to creating a flawed system for resolving special education disputes

in the State of Tennessee; selecting the APD as the adjudicative body for special education disputes and failing to ensure proper training and expertise of the APD and the ALJs; allowing the unreasonable delay in special education cases to continue without efforts to rectify the problem; allowing the repeated and consistent violation of the regulatory timeline for special education due process hearings; and failing to provide Plaintiffs an independent tribunal / adjudicatory body to resolve special education disputes in compliance with federal law.

495. Defendants knew or should have known that they were denying Plaintiffs their rights in violation of statutory law.

496. Defendants knew or should have known that they were denying Plaintiffs due process of law.

497. Defendants knew or should have known that they were impeding, impairing, prejudicing, and/or violating Plaintiffs' constitutional rights to have a proper forum in which to enforce federal statutory law.

498. Defendants acted intentionally, wantonly, and/or with deliberate indifference to Plaintiffs' clearly established constitutional rights.

499. Plaintiffs are harmed because the education system and dispute resolution system for children with disabilities has broken down in the State of Tennessee.

500. Plaintiffs are harmed because school districts, LEAs, and their counsel know that they can unfairly benefit from the unholy alliance as described above and outlast the cost and delays in litigating special education disputes due to the APD's conflict of interest and preferential treatment of LEAs.

501. Plaintiffs have exhausted their administrative remedies as required by IDEA because the DP Case went to a final Decision.

502. IDEA contemplates that "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency." 20 U.S.C. §1415(f)(1) ( emphasis added.)

503. As discussed at length *supra*, Plaintiffs did not have an opportunity for an impartial due process hearing in the DP Case.

504. Defendants have violated Plaintiffs most fundamental rights under IDEA and its regulations.

505. As a direct and proximate result of the violations of §1983 by Defendants, Plaintiffs have suffered serious damages including special and general damages according to proof.

506. As a direct and proximate result of Defendants violations of §1983 and the regulations promulgated thereunder, Plaintiffs have been harmed because SCS has been permitted to deny SCS a FAPE; block Plaintiffs' unilateral private

placement of D.T.; pursue truancy charges and obtain a conviction of such charges against Plaintiffs; and otherwise prosecute a special education due process case outside the boundaries of IDEA and its regulations, all with the imprimatur of ALJs Cambron and Stovall, the APD and TNDOE.

507.   As a direct and proximate result of Defendants violations of §1983 and the regulations promulgated thereunder, Plaintiffs have fallen victim and been harmed by the systemic violations of the special education dispute resolution system.

508.   As a direct and proximate result of Defendants violations of §1983 and the regulations promulgated thereunder, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in enforcing their special education legal rights against SCS who was wrongfully subverting them.

509.   As a direct and proximate result of Defendants violations of §1983 and the regulations promulgated thereunder, Plaintiffs have been harmed because ALJ Stovall issued his June 29, 2020 Final Order in SCS' favor when SCS should have lost the case and erroneously granting SCS prevailing party status.

510.   Defendants' actions were engaged in with malice and/or reckless indifference to Plaintiffs' rights.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A. Overturning and/or vacating ALJ Stovall's June 29, 2020 Final Order as error;

B. Declaring that Defendants have violated §1983 and Plaintiffs' rights thereunder;

C. Declaring that Defendants' actions in the DP Case were retaliatory in response to Plaintiffs engaging in a protected activity, namely asserting their special education legal rights, and therefore a violation of their Constitutional and civil rights;

D. Declaring that Defendants' actions were engaged in with malice and/or reckless indifference to Plaintiffs' rights;

E. Compensatory damages in the amount of $5,000,000.00;

F. Punitive damages in an amount in excess of $50,000,000.00;

G. An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

H. For such other and further relief as the Court deems equitable and just.

## COUNT NINETEEN – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Defendant SCS)

511. Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

512.   SCS owed a duty to Plaintiffs, as a family with a child with a disability designated as eligible for special education services, to abide by IDEA's Procedural Safeguards, respect Plaintiffs' rights to enforce IDEA, and not to harm them if and when Plaintiffs chose to assert those rights.

513.   SCS also owed a duty to Plaintiffs as a public school system, funded by both the federal and Tennessee governments, to operate with equal protection under the law and due process of law for D.T., as a child with a disability, and his family.

514.   SCS also owed a duty to Plaintiffs as a public school system, funded by both the federal and Tennessee governments, to accurately provide information regarding the education opportunities afforded Plaintiffs as a family with a child with a disability.

515.   SCS breached its duty owed to Plaintiffs by threatening, filing, pursuing, and obtaining a conviction for truancy charges against Plaintiffs.

516.   SCS also breached its duty owed to Plaintiffs by blocking and preventing Plaintiffs from asserting their legal rights and have equal protection under the law and due process of law.

517.   SCS also breached its duty owed to Plaintiffs by hiding information, whether negligently or intentionally, regarding the education opportunities and all alternatives afforded D.T., as a child with a disability, and his family, including

without limitation SCS' policy on appeals of unexcused absences and that schools like The Farm School are Category IV schools under Tennessee law and was an alternate method of compliance with the Tennessee Compulsory School Attendance Law thereby preventing truancy charges against Plaintiffs.

518.   As a direct and proximate result of SCS' breaches of its duties owed to Plaintiffs, Plaintiffs have suffered serious damages including special and general damages according to proof.

519.   As a direct and proximate result of SCS' breaches of its duties owed to Plaintiffs, Plaintiffs were convicted of truancy charges and violation of the Tennessee Compulsory School Attendance Law.

520.   As a direct and proximate result of SCS' breaches of its duties owed to Plaintiffs, Plaintiffs have suffered severe emotional distress and serious mental injury due to the damage to Plaintiffs' reputation in the community, among friends, and the costs associated with the trial and criminal conviction of Plaintiffs.

521.   As a direct and proximate result of SCS' breaches of its duties owed to Plaintiffs, Plaintiffs have suffered severe emotional distress and serious mental injury due to the financial toll on their family from all of the litigation caused by SCS to defend against the truancy charges and enforce their legal rights.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against SCS as follows:

A.    Compensatory damages in the amount of $5,000,000.00;

B.    An award of attorney's fees and costs for Plaintiffs and granting

Plaintiffs the opportunity to file a fee petition for such award; and

C.    For such other and further relief as the Court deems equitable and just.

## COUNT TWENTY – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Defendant SCS)

522.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

523.    SCS' actions by threatening, filing, pursuing, and obtaining a conviction for truancy charges against Plaintiffs in response to Plaintiffs enforcing their legal rights was intentional and reckless.

524.    SCS' actions by hiding and/or misrepresentation information regarding education opportunities available to Plaintiffs so that SCS could pursue truancy charges against Plaintiffs in response to Plaintiffs enforcing their legal rights was intentional and reckless.

525.    SCS' actions by blocking and preventing Plaintiffs from asserting their legal rights and have equal protection under the law and due process of law was intentional and reckless.

526.    SCS' actions against Plaintiffs, a family with a child with a disability, are so outrageous as to shock the conscience and which are not tolerated in

civilized society. Indeed, SCS has a heightened responsibility to children like D.T. and their families to ensure that compliance with special education and anti-discrimination laws is full and precise and its failure to do so in this case is beyond contemptible.

527. As a direct and proximate result of SCS' conduct, Plaintiffs have suffered serious damages including special and general damages according to proof.

528. As a direct and proximate result of SCS' conduct, Plaintiffs were convicted of truancy charges and violation of the Tennessee Compulsory School Attendance Law.

529. As a direct and proximate result of SCS' conduct, Plaintiffs have suffered severe emotional distress and serious mental injury due to the damage to Plaintiffs' reputation in the community, among friends, and the costs associated with the trial and criminal conviction of Plaintiffs.

530. As a direct and proximate result of SCS' conduct, Plaintiffs have suffered severe emotional distress and serious mental injury due to the financial toll on their family from all of the litigation caused by SCS to defend against the truancy charges and enforce their legal rights.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against SCS as follows:

A.    Compensatory damages in the amount of $5,000,000.00;

B.    Punitive damages in the amount of $20,000,000.00;

C.    An award of attorney's fees and costs for Plaintiffs and granting

      Plaintiffs the opportunity to file a fee petition for such award; and

D.    For such other and further relief as the Court deems equitable and just.


Dated:  August 27, 2020          By: /s/ *Robert C. Thurston*
                                 Robert C. Thurston, Esq. (*pro hac vice*
                                 *pending*)
                                 Thurston Law Offices LLC
                                 100 Springdale Road A3
                                 PMB 287
                                 Cherry Hill, NJ 08003
                                 Telephone: (856) 335-5291
                                 Email: rthurston@schoolkidslawyer.com

                                 By: /s/ *Michael F. Braun*
                                 Michael F. Braun, Esq. (BPR 032669)
                                 Post Office Box 364
                                 Brentwood, TN 37024
                                 (615) 378-8942
                                 mfb@braun-law.com

                                 Attorneys for Plaintiffs